**UNITED STATES of America, Plaintiff,**

v.

**GOLDEN ACRES, INC., J.L. Capano, Inc., Joseph L. Capano and Mario B. Capano, Defendants.**

**Civ. A. No. 85–179–JRR.**

United States District Court,
D. Delaware.

Dec. 19, 1988.

William C. Carpenter, Jr., U.S. Atty. and Charlene D. Davis, Asst. U.S. Atty., U.S. Dept. of Justice, Wilmington, Del. (John R. Bolton, Asst. Atty. Gen., J. Christopher Kohn, Robert M. Hollis and Gregory A. Harrison, U.S. Dept. of Justice, Washington, D.C., and Patricia G. Beatley, Dept. of Housing & Urban Development, Washington, D.C., of counsel), for plaintiff.

L. Vincent Ramunno, of Ramunno & Ramunno, Wilmington, Del., for defendants.

## OPINION

ROTH, District Judge:

The United States of America, representing the interests of the Department of Housing and Urban Development (HUD), filed this suit against defendants Golden Acres, Inc., J.L. Capano, Inc., Joseph L. Capano, and Mario B. Capano, on March 21, 1985. On April 15, 1988, we granted plaintiff's motion for summary judgment against J.L. Capano, Inc., Joseph L. Capano, and Mario B. Capano, (the Capanos) for violation of the Federal Priority Statute, 31 U.S.C. § 3713, *United States v. Golden Acres, et al.*, 684 F.Supp. 96 (D.Del.1988), thus holding the Capanos liable for $466,-760.54 paid to them or to corporations they controlled between October 1, 1976, and December 31, 1981. The issue of whether prejudgment interest would be awarded to HUD on this recovery was left for later determination. On April 19, 1988, we entered a default judgment for $991,516.23 against defendant Golden Acres, Inc. for breach of a HUD security instrument known as a "Regulatory Agreement." However, Golden Acres, Inc., as a corporate entity, has been void and defunct for over five years.

The issues now before the Court are whether to award prejudgment interest on the $466,760.54 judgment against the Capanos and whether to pierce the corporate veil of Golden Acres, Inc. ("Golden Acres") and hold defendants J.L. Capano, Inc., Joseph L. Capano, and Mario B. Capano liable for the default judgment against Golden Acres. A bench trial on this question was held on April 18 and 19, 1988. Pursuant to Fed.R.Civ.P. Rule 52(a), we now make the following findings of fact and conclusions of law.

### FINDINGS OF FACT[1]

In March, 1972, P. Donald Woodall hired Joseph L. Capano to construct an 88–unit apartment project located in New Castle County, Delaware. The project was owned by Golden Acres, Inc., a Delaware corporation. Mr. Woodall and his wife owned all of the outstanding Golden Acres stock.

On March 28, 1974, Golden Acres executed and delivered to the Central Mortgage Company a Mortgage Note for $1,389,100. The Mortgage Note was secured by a mortgage encumbering the project. Concurrently, HUD insured repayment of the Mortgage Note in accordance with the National Housing Act, 12 U.S.C. § 1715*l* (d)(4) (1982), a provision designed to assist private industry in providing rental housing to low and moderate income families. In consideration for the insurance, Golden Acres signed a Regulatory Agreement with HUD. The Regulatory Agreement and mortgage were duly and properly recorded.

HUD relies on Regulatory Agreements like the one signed by the Woodalls to retain control of apartment projects such as Golden Acres. The Agreement places substantial restrictions on the mortgagor's operation of a multifamily project. It controls the amount of rent that may be charged, establishes a reserve for a replacement fund, requires prompt mortgage payments, restricts the use of the rents and income of the project, and prohibits conveyance, transfer, or encumbrance of the property.

The amount borrowed by Golden Acres under the mortgage fell short of the total construction costs for the apartment complex. Accordingly, on the same day that the mortgage and Regulatory Agreement were executed, the Woodalls personally executed a promissory note and memorandum of agreement with and to J.L. Capano, Inc. for $234,000, the balance owing to J.L. Capano, Inc. for construction costs. Under the terms of these documents, the Woodalls had until December 30, 1974, to pay J.L. Capano, Inc. If the Woodalls failed to make payment by that date, they would have to surrender all their capital stock in Golden Acres to J.L. Capano, Inc.

---

1. For prior proceedings and background in this litigation, *see* this Court's previous memorandum opinion, *United States v. Golden Acres, et al.*, 684 F.Supp. 69 ("Mem. Op."). For the sake of completeness, some description of facts made by this Court in that opinion will be repeated here.

The Woodalls failed to meet their obligation on the promissory note. As a result, on January 7, 1975, J.L. Capano, Inc. took control of all Golden Acres stock. The Woodalls resigned as officers of Golden Acres. Joseph L. Capano and Mario B. Capano became the sole officers and directors of Golden Acres. Mario B. Capano assumed control of corporate finances, including the payment of creditors. From this time until December 8, 1981, J.L. Capano, Inc. owned 100 percent of Golden Acres stock. In turn, Mario B. Capano and Joseph L. Capano each owned 50 percent of the stock in J.L. Capano, Inc. and were its sole officers, directors, and shareholders.

On January 7, 1975, when the Capanos, through J.L. Capano, Inc., assumed control of Golden Acres, the corporation was still current on its monthly mortgage payments to HUD. Golden Acres continued to be current on the mortgage while under the Capanos' control until May 1, 1976, when it failed to make the mortgage payment then due. Thereafter, Golden Acres failed to make sufficient payments to bring the loan current. On September 29, 1976, HUD, pursuant to its role as insurer, was assigned the Mortgage Note and Mortgage.

It is not difficult to ascertain why Golden Acres was not able to make its mortgage payments to HUD after the Capanos took control. When the Capanos obtained the Golden Acres stock pursuant to the Woodalls' agreement with J.L. Capano, Inc., the Capanos did not consider the Woodalls' debt to J.L. Capano, Inc. to have been satisfied; rather, they viewed ownership of Golden Acres as a means to regain the $234,000 construction costs which the Woodalls had failed to pay them. Mario Capano testified that he believed, when he obtained the Golden Acres stock, it was as if he had obtained the key to a safe deposit box, and he could then get in the box and obtain the money inside. M. Capano Tr. B–23–24. Getting paid the $234,000 was the Capanos' primary goal, despite their knowledge of the outstanding mortgage debt that Golden Acres owed to HUD. In fact, Mario Capano perceived himself to be a senior creditor to HUD. M. Capano Dep. p. 47.

Unfortunately, the Capanos could not "repay" themselves out of Golden Acres' profits because there were no profits. M. Capano Tr. B–11–12. Not only were there no profits, but in fact the 1975–78 end of the year balance sheets reveal that the corporation's liabilities exceeded its assets for those years. While no corporate records for the period after 1978 have been introduced, defendants have also admitted that the value of the assets of Golden Acres was less than the value of its liabilities for the years 1976 to 1981, inclusive. Ex. 4 at 2, Ex. 5 at 2, Ex. 7 at 2, Ex. 8 at 2, Ex. 11 at 5.

In the mid–1970's, when they took control of Golden Acres, Mario and Joseph Capano had a practice of creating a separate corporation for each new construction project. In fact, J.L. Capano, Inc. and Golden Acres were just two of the approximately 40 corporations the Capanos have operated to date. All of the Capano corporations were closely held and would appear to have been very informally operated. For example, in operating and managing J.L. Capano, Inc., between January 7, 1975, and December 8, 1981, no formal board of directors' or stockholders' meetings for the corporation were ever held. J.L. Capano, Inc. is now a defunct, nonoperating corporation.

Similarly, no formal meetings for Golden Acres were ever held. Furthermore, the Capanos maintained no corporate records for Golden Acres, except for tax returns and accounting books. The corporate kit and minute book for Golden Acres were never opened. And while Joseph L. Capano was listed as an officer and director of Golden Acres, he never formally functioned in that capacity. Mario Capano considered Golden Acres to be his project and he handled it as he saw fit. M. Capano Tr. A–175–176.

The Capanos also took a casual approach to the finances of Golden Acres. In addition to the fact that the corporation was insolvent, that it never had any net income or profits, and that it always operated at a loss, neither J.L. Capano, Inc., Joseph Ca-

pano, nor Mario Capano ever contributed to Golden Acres any money which they intended to be an investment of equity or capital, without expectation of repayment. M. Capano Tr. A–186–87, A–199. While the Capanos would sometimes make informal, undocumented loans to Golden Acres through other corporations they controlled, these loans were made to protect the apartment building—the corporate asset—so that it would continue to generate funds and enable them to recover the money they believed was owed them. No attempts were made to improve the capital position of the corporation itself. *Id.*.

Moreover, between January 7, 1975 and December 8, 1981, Golden Acres never declared or paid any dividends. Whenever excess cash was left in the corporate checking account after bills and payroll had been paid at the end of the month, Mario Capano would write a check for the balance remaining payable to himself, his brother, or companies they owned and controlled. M. Capano Tr. A–183. In fact, $466,760.54 of all the payments made by Golden Acres between May 12, 1978, and December 31, 1981, were made to Mario B. Capano, Joseph L. Capano, J.L. Capano, Inc., J.L. Capano Builders, Inc., or other companies that the Capanos owned or controlled. Ex. 12 at 6–25, Ex. 13, Ex. 14. These payments were intended by the Capanos to repay to them the preexisting $234,000 principal debt, plus an arbitrary rate of interest that they believed was owed by Golden Acres. These payments are represented by 129 separate checks dated between May 12, 1978, and December 8, 1981. *Id.;* J. Capano Tr. A–147–48.

At various times between the fall of 1976 and spring of 1979, the Capanos and HUD discussed workout plans for the defaulted mortgage. These negotiations ultimately proved futile. Fearing HUD foreclosure was imminent, the Capanos continued and indeed accelerated their program of repayment of the debt they believed Golden Acres, Inc. owed them. M. Capano Tr. B–10–11.

On June 25, 1979, HUD declared the Mortgage Note in default and accelerated the principal to become immediately due and payable. HUD initiated foreclosure proceedings on February 19, 1980. On August 26, 1981, this Court granted orders of foreclosure. *United States v. Golden Acres, Inc.*, 520 F.Supp. 1073 (D.Del.1981).

On December 8, 1981, J.L. Capano, Inc. sold its stock in Golden Acres, Inc. to Sutton Place Corporation for $25,000. HUD gave no written permission for this transfer of stock. Golden Acres, Inc. was declared void and defunct by the Delaware Secretary of State on March 1, 1983, for nonpayment of franchise taxes. On March 3, 1982, HUD purchased the apartment project at a public, judicial foreclosure sale for $1,300,000. This Court confirmed the sale on March 15, 1982.

The Government filed this suit against defendants J.L. Capano, Inc., Joseph L. Capano, Mario B. Capano, and Golden Acres on March 21, 1985. The First Amended Complaint charges that defendant Golden Acres breached its Regulatory Agreement with HUD; that the payments in violation of the Regulatory Agreement should have been held in trust for plaintiff; that defendants violated the Federal Priority Statute, 31 U.S.C. § 3713; that the Capanos should be deemed constructive trustees of the monies distributed in violation of the Regulatory Agreement; and that the Capanos should be held individually liable under the alter ego theory for payments made by Golden Acres in violation of the Regulatory Agreement.

A default was entered against defendant Golden Acres pursuant to Rule 55(a), Fed. R.Civ.P., for failure to plead or otherwise defend against the Complaint and the First Amended Complaint. Docket Item ("D.I.") 21. At trial, we determined that plaintiff was entitled to a default judgment against defendant Golden Acres in the sum of $991,516.23, as of April 18, 1988. D.I. 97.[2]

---

**2.** The amount of the default judgment was determined by the Deputy Director of the Office of Finance and Accounting of HUD, Albert M. Miller. Plaintiff filed two affidavits of Mr. Miller, one on February 2, 1988 and a corrected version on April 15, 1988. D.I. 96. This method of

The case proceeded to trial on April 18 and 19, 1988. The Court heard testimony on the issue of piercing the corporate veil of Golden Acres, which would leave the Capanos individually liable for the amount of the default judgment. Because Golden Acres is now a defunct corporation, it is apparent that the default judgment by itself is worthless unless the corporate veil is pierced.

## CONCLUSIONS OF LAW

### I. DEFENDANTS' INDIVIDUAL LIABILITY

#### A. *Applicable Law*

This Court must first determine if federal or Delaware law will control the issue of whether to pierce the corporate veil of Golden Acres. For the reasons stated below, we hold that federal law applies.

The Supreme Court has consistently held that federal law controls the Government's rights under federal nationwide lending programs. *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979). Furthermore, where the Government has sought to recover a deficiency after foreclosure of a mortgage insured by and assigned to or held by a Government agency such as the Small Business Administration, the Veterans Administration, or the Fair Housing Administration, federal law is the source of the Government's rights and remedies. *United States v. Gish,* 559 F.2d 572, 574–75 (9th Cir.1977), *cert. denied,* 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978); *United States v. Wells,* 403 F.2d 596, 597–98 (5th Cir.1968); *Herlong–Sierra Homes, Inc. v. United States,* 358 F.2d 300 (9th Cir.1965), *cert. denied,* 385 U.S. 919, 87 S.Ct. 229, 17 L.Ed.2d 143 (1966).

■ Actions for breach of HUD's Regulatory Agreement arise under and are determined by federal law. *United States v. Haddon Haciendas Co.,* 541 F.2d 777, 783–85 (9th Cir.1976). Specifically, courts have construed *Kimbell Foods* as requiring the application of federal law when HUD is enforcing its rights and remedies after default of a HUD-held loan. *See, e.g., United States v. Landmark Park & Assocs.,* 795 F.2d 683, 684–86 (8th Cir.1986); *United States v. Victory Highway Village, Inc.,* 662 F.2d 488, 497 (8th Cir.1981).

In this case, the United States has obtained a judgment against Golden Acres for breach of the Regulatory Agreement between HUD and the corporation. Since federal law governs the Government's rights and remedies here, federal law must be applied to determine whether the default judgment can be enforced against the Capanos, the former officers, directors, and shareholders of Golden Acres.

#### B. *The Federal Standard*

We must next determine the applicable federal standard for piercing the corporate veil in this case. While controversies directly affecting the operation of federal programs are governed by federal law, this does not necessarily require resort to a uniform federal rule. On the contrary, state commercial law may be adopted as the appropriate federal rule in situations such as determining the relative priority of competing liens. *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 718, 99 S.Ct. 1448, 1453, 59 L.Ed.2d 711 (1979).

The *Kimbell Foods* Court identified three factors for courts to examine in determining whether to incorporate state law or fashion a uniform federal rule; first, whether incorporation of state law would frustrate specific objectives of federal programs; second, whether a need for national uniformity exists; and, third, whether application of a federal rule would significantly disrupt existing commercial relationships based on state law. *Kimbell Foods,* 440 U.S. at 728–29, 99 S.Ct. at 1458–59.

In *United States v. Pisani,* 646 F.2d 83 (3d Cir.1981), the Court of Appeals for the Third Circuit applied the *Kimbell Foods* analysis to determine the federal standard for piercing the corporate veil. *Pisani* was an action by the Government to recover Medicare overpayments made to a medical

valuation is proper according to Rule 55(b)(2), Fed.R.Civ.P.

corporation. The court held that a uniform federal alter ego standard was necessary, based on its evaluation of the first two factors in the *Kimbell Foods* analysis, frustration of the Government's objectives in dispensing Medicare benefits and the need for uniformity in the Medicare program. *Pisani,* 646 F.2d at 86–87.

Specifically, the *Pisani* court expressed concern that incorporation of state law might lead to adoption of a rule which afforded too much protection to a person who was merely the alter ego of a defunct corporation, thus frustrating the Medicare objectives of prompt reimbursements to providers and of assistance to patients. 646 F.2d at 86. If shareholder-doctors could pass overpayments through insolvent corporations for the doctors' own benefit, the *Pisani* court reasoned, the Medicare system might become bogged down by the need to investigate carefully each provider's actual costs and assets before making payments. The alternative would be a degeneration of Medicare into a "welfare program for doctors and hospitals." *Id.*

In the present case, there may be similar risks to incorporation of state law as the standard to apply. If Delaware courts are indeed as reluctant to pierce the corporate veil as defendants allege (Defendants' Post–Trial Brief and Proposed Findings of Fact (Defendants' Brief) at 24), then application of Delaware law in cases such as this one would frustrate the national housing policy behind the HUD program which insured Golden Acres' mortgage.[3] To paraphrase the *Pisani* court, the loan and insurance programs under the National Housing Act (NHA) were not intended to serve as welfare programs for commercial developers and landlords. Deficiency losses such as the one incurred by HUD in this case diminish the funds available for new projects, for replacements and for emergency repairs, thus directly impairing federal objectives. Myers Tr. A–54–56.

The *Pisani* court also based its rejection of state law on the second factor in the *Kimbell Foods* analysis, a perceived need for uniformity in the Medicare program. *Pisani,* 646 F.2d at 87. The *Pisani* court distinguished Medicare reimbursements from the Small Business Administration (SBA) loans which led the Supreme Court to incorporate state law in *United States v. Yazell,* 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed. 2d 404 (1966). *Pisani,* 646 F.2d at 87. While incorporation may have been proper under the circumstances in *Yazell,* the *Pisani* court reasoned, a uniform federal law was necessary where defendants had received Medicare payments under a uniform federal statute. *Id.* The relevant inquiry for this Court would thus appear to be whether NHA loan insurance is more like the Medicare payments in *Pisani* or the SBA loans in *Yazell.* That question has been answered for us by the Supreme Court.

In *Yazell,* the Court held, over the Government's objections, that the Texas law of coverture, which precluded married women from binding separate property, would apply to an action on a federal SBA loan which was individually negotiated in detailed language and with specific references to Texas law. However, the *Yazell* Court distinguished the SBA loan from nationwide acts of the Government "emanating in a single form from a single source." 382 U.S. at 348, 86 S.Ct. at 504. The *Yazell* Court specifically identified one such nationwide act as the NHA, "which issues separate forms for each State but does not negotiate with individual applicants," *id.* n. 15; the implication being that, with respect to NHA transactions, federal law should apply. *See also United States v. Helz,* 314 F.2d 301 (6th Cir.1963) (in action on loan made under NHA, federal interest too strong to allow incorporation of a Michigan coverture statute, and federal law applied instead).

---

**3.** As Donald A. Myers, a Director in HUD's Multi–Family Housing Management Division, testified at trial, Golden Acres fell under HUD's 221(d)(4) program. Myers Tr. A–48. The 221(d)(4) program was developed to provide safe, decent, sanitary housing for moderate in-

come persons. 12 U.S.C. § 1715*l*(d)(4). *See also United States v. Winthrop Towers,* 628 F.2d 1028, 1036 (7th Cir.1980) ("... the National Housing Act was primarily intended to benefit individuals who live in inadequate housing, not commercial developers." (citations omitted)).

In order to ensure the promotion of the federal objectives of the NHA and uniform enforcement of HUD-held loan agreements, the federal alter ego standard must govern the Capanos' liability. We do not decide the issue of whether Delaware law would pierce the corporate veil of Golden Acres. We do note that *Pauley Petroleum, Inc. v. Continental Oil Company*, 239 A.2d 629 (Del.1968) and *Terry Apartment Assocs. v. Associated–East Mtg. Co.*, 373 A.2d 585 (Del. Ch. 1977), the only cases cited by defendants in support of their argument for incorporation of Delaware law, are not on point as both dealt with the issue of whether to pierce the corporate veil in the parent-subsidiary context.

Furthermore, with respect to the broad language of the cases cited by defendants, we find that the Delaware test for piercing the corporate veil is altogether compatible with the federal analysis laid out in *Pisani*. It is simply broader. *See, e.g., Pauley*, 239 A.2d at 633 (corporate veil may be pierced "in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable considerations among members of the corporation require it, are involved"). Thus, even if we were to incorporate Delaware law in this case, we might well look to federal cases such as *Pisani* for more specific guidance.

## C. *Piercing the Corporate Veil*

### 1. The *Pisani* Test

In order to determine the federal alter ego standard, the *Pisani* court turned to other cases articulating the alter ego theory. Specifically, the *Pisani* court adopted the analysis used by the Fourth Circuit Court of Appeals in *Dewitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d

681 (4th Cir.1976) (corporate veil pierced to impose individual liability on president of fruit brokerage corporation in light of undercapitalization, siphoning of funds, and misrepresentations made to the corporation's creditors).[4]

■ According to the *Dewitt* court, an alter ego analysis must start with an examination of factors which reveal how the corporation operates and the particular defendant's relationship to that operation. These factors include whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder. 540 F.2d at 686–87. The *Dewitt* court emphasized that no single factor could justify a decision to disregard the corporate entity, but that some combination of them was required, and that an overall element of injustice or unfairness must always be present, as well. *Id.*

Of all of these factors, the *Dewitt* court emphasized that the one "that all the authorities consider significant in the inquiry, and particularly in the case of ... a closely held corporation" is inadequate capitalization. 540 F.2d at 685 (citations omitted). The court emphasized that the obligation to provide sufficient capitalization is an ongoing one, which begins at the time of incorporation and continues throughout the corporation's existence. *Id.*

■ Defendants do not deny that Golden Acres was undercapitalized, and undercapi-

---

**4.** Since being adopted by the *Pisani* court, the *Dewitt* alter ego analysis has been applied repeatedly by the Third Circuit. *See, e.g., Carpenters Health. & Welfare Fund v. Ken. R. Ambrose, Inc.*, 727 F.2d 279, 284 (3d Cir.1983) (alter ego theory would not support piercing corporate veil to impose personal liability against officers under Labor Management Relations Act); *American Bell Inc. v. Federation of Tel. Workers*, 736 F.2d 879, 886 (3d Cir.1984) (alter ego doctrine did not bind transferee subsidiary to trans-

ferror's collective bargaining agreement); *Solomon v. Klein*, 770 F.2d 352, 353–54 (3d Cir.1985) (corporate veil not pierced where appellants failed to proceed on an alter ego basis). Thus, despite defendants' argument that the *Pisani* court never intended to formulate a uniform federal rule for piercing the corporate veil, *Pisani* has become the settled rule of law in this Circuit, and will govern our analysis in this case.

talization is apparent from the fact that Golden Acres defaulted on its mortgage and failed to meet its obligations from 1976 to 1982. However, defendants argue that this undercapitalization is attributable to HUD, since HUD insured the loan to Golden Acres in the first place, despite knowledge that Golden Acres was financed well below the 10 percent minimum capitalization which HUD usually requires for such insurance.

Defendants' thinly veiled estoppel argument lacks merit for two reasons. First, while HUD can be charged with knowledge of Golden Acres initial undercapitalization, the corporation continued to be undercapitalized after defendants took control. Thus, regardless of any act of HUD, defendants breached their ongoing duty to maintain adequate capitalization.

Second, defendants' argument ignores the settled rule of law that the "Government may not be estopped on the same terms as any other litigant." *Heckler v. Community Health Services of Crawford*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) (Government not estopped from recouping Medicare overpayments from provider, notwithstanding provider's reliance on intermediary's representations that the overpayments would not have to be repaid). While the *Heckler* Court expressly declined to hold that estoppel could never be asserted against the Government, it did state that extreme conditions, such as governmental deception and detrimental reliance by private parties, would have to be present for estoppel to be available. *Id.*

HUD's willingness to relax its initial capital investment requirement in this case can in no way be construed as deceitful. And defendants certainly have not suffered any detriment as a result of HUD's willingness to insure the loan. Defendants were not in fact required to take over operation of the complex. Thus, this is not one of those extraordinary cases where estoppel is available against the Government.[5]

Another group of factors in the *Pisani* alter ego analysis relates to whether the corporation was operated with sufficient regard for the corporate formalities. *Pisani*, 646 F.2d at 88. Of particular relevance to this inquiry are whether adequate corporate records were kept, directors and shareholders met regularly, and corporate directors and officers functioned properly. *Id.* Defendants argue that, given the closely held character of Golden Acres, their duty to observe corporate formalities was satisfied by their informal, irregular "directors meetings", timely filing of tax returns, maintaining of accounting books, and the functioning of one of the corporation's two directors. However, the law of this Circuit indicates that defendants have underestimated their responsibilities.

The *Pisani* court considered the absence of corporate formalities persuasive in that case even though the corporation was solely owned. 646 F.2d at 88. *Pisani* thus implicitly rejected an earlier statement made by the Third Circuit in a footnote that corporate formalities are "of little consequence" in the context of closely held corporations. *Zubik v. Zubik*, 384 F.2d 267, 271 n. 4 (3d Cir.1967), *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968). The logic of the *Zubik* footnote had already been explicitly criticized by the *Dewitt* court. 540 F.2d at 686 n. 14 ("The two cases cited [by the *Zubik* court] in support do not entirely support the broad conclusion stated ...").

Recently, courts have recognized the importance of corporate formalities even where the corporation concerned is closely held. For example, in *Valley Finance, Inc. v. United States*, 629 F.2d 162, 172 (D.C.Cir.1980), the court held that even though the corporation was solely owned, conducting board of directors meetings where directors had no significant influence on corporate decision-making did not

---

5. The *Heckler* Court stated in a footnote that "This principle also underlies the doctrine that an administrative agency may not apply a new rule retroactively when to do so would unduly intrude upon reasonable reliance interests." 467 U.S. at 61 n. 12, 104 S.Ct. at 2224 n. 12. That situation is clearly distinguishable from HUD's attempts to enforce a policy which was already in force when Golden Acres applied for HUD loan insurance.

constitute sufficient regard for corporate formalities. Given the admittedly nominal role of Joseph Capano as president of Golden Acres, and the correspondingly one-sided nature of defendants' "directors meetings," defendants' behavior indicates a disregard of corporate formalities, as well.

Defendants also failed to meet their duty to observe corporate formalities with respect to the corporate records of Golden Acres. While corporate tax returns were filed and accounting books maintained, the corporate kit and record book were never even opened. The *Pisani* court considered the absence of adequate records to be significant in its alter ego analysis even though the corporation was solely owned. 646 F.2d at 88. This same absence indicates a comparable disregard of corporate formalities by the Capanos.

Also important to the *Pisani* court in its alter ego analysis were factors indicating that the corporation's finances were not properly maintained. 646 F.2d at 88. More specifically, the court looked to whether the corporation was solvent, dividends were paid, or funds were siphoned. *Id.*

Defendants argue that Golden Acres was not insolvent. However, we have already ruled that, for the purposes of this action, defendants have admitted the insolvency of the corporation. 684 F.Supp. at 97. Defendants failed to respond to plaintiff's request for an admission that "the value of the assets of Golden Acres, Inc. was less than the liabilities of Golden Acres, Inc." for the period of 1976 through 1981. D.I. 54. Accordingly, pursuant to Rule 36(a), Fed.R.Civ.P., these matters were deemed admitted. Furthermore, we denied defendants' motion to withdraw these admissions pursuant to Rule 36(b). 684 F.Supp. at 97.

Defendants do not deny that Golden Acres never declared or paid dividends while they controlled the corporation. The absence of dividends, along with the corporation's insolvency, is further evidence that defendants were not operating Golden Acres as a viable corporation, trying to maximize profits, pay off debt and distribute excess earnings through dividends. *Pi-sani*, 646 F.2d at 88. *Dewitt*, 540 F.2d at 688.

Even more significant to the alter ego analysis is the reason why Golden Acres was insolvent and incapable of paying dividends: defendants were siphoning funds out of the corporation at regular intervals. Despite a mounting mortgage debt and an insolvent corporate shell, after paying bills and payroll each month, Mario Capano would write a check to himself, to his brother, or to companies they controlled for whatever balance remained in the corporate checking account. Between May 12, 1978 and December 31, 1981, $466,760.54 was siphoned out of the corporation in this manner. 684 F.Supp. at 100.

By acting with total disregard for corporate formalities and financial well-being in their operation of Golden Acres, defendants effectively used the corporation as an "incorporated pocketbook." *Valley Finance*, 629 F.2d at 172. Any cash infusions into the corporations were by short-term loan only. The Capanos had no concern for Golden Acres' balance sheet, they just wanted to keep the apartment project secure enough to continue generating funds.

All of the foregoing factors provide evidence that the final *Pisani* factor was present in this case, as well: Golden Acres was merely a facade for defendants' operations. *Pisani*, 646 F.2d at 88. Defendants operated the apartment complex as if they owned it outright, not as shareholders in a corporation which had defaulted on its mortgage on the building and still had payments to make. Now they are trying to rely on the very entity they ignored to shield themselves from liability to the corporation's creditors.

This case not only presents all of the factors favoring piercing the corporate veil set out in *Dewitt* and *Pisani*, but also demonstrates the requisite element of injustice or unfairness. *Dewitt*, 540 F.2d at 687. *Pisani*, 646 F.2d at 88. As the *Pisani* court noted, the presence of a number of these factors may be itself be sufficient evidence of injustice or unfairness. *Id.*

Even if unfairness or injustice had to be shown independently from the factors set out above, that burden has been met by the plaintiff. When it agreed to insure the loan to Golden Acres, HUD naturally assumed that Golden Acres would be managed like a normal corporation, with sufficient regard for solvency, corporate formalities, and corporate obligations. Refusal to pierce the corporate veil in this case would be unfair in that it would punish HUD for its misplaced trust and reward defendants for their abuse of the corporate form.

Defendants argue that it would be unfair to them to pierce the corporate veil of Golden Acres since HUD "sat on its hands and its rights" from the time of the original default until foreclosure, a period of over five years. Defendant's brief at 27. As a preliminary matter, this argument ignores the fact that over a year of this period was spent in negotiating the failed workout agreement.

■ Furthermore, any attempt by defendants to assert the defense of laches must fail. Sovereign immunity bars assertion of certain defenses against the United States, such as laches and state statutes of limitation, when the Government sues to enforce its rights. *United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940); *United States v. Gera*, 409 F.2d 117, 120 (3d Cir.1969). This rule was developed to prevent unfair prejudice to the public interest as a result of the inaction or negligence of Government employees. *See United States v. Nashville Chattanooga & S.L. R.R. Co.*, 118 U.S. 120, 125, 6 S.Ct. 1006, 1008, 30 L.Ed. 81 (1886).

Defendants' argument that the corporate veil of Golden Acres may not be pierced in the absence of plain fraud is, as well, without merit. Stated simply, "proof of plain fraud is not a necessary element in a finding to disregard the corporate entity." *Dewitt*, 540 F.2d at 684 (citation omitted). The *Pisani* court emphasized the need for an alter ego doctrine that did not require a finding of fraud: "If HEW had to prove fraud where such a defendant kept no cor-

porate records and inadequate books, such schemes would be difficult to prevent." *Pisani*, 646 F.2d at 89.

**2. Frustration of a Government Program**

■ Plaintiffs have presented us with a convincing alternative basis for holding that the corporate veil of Golden Acres should be pierced. It is that "... the corporate entity may be disregarded where failure to do so would lead to circumvention of a statute or avoidance of a clear legislative purpose." *United States v. Normandy House Nursing Home, Inc.*, 248 F.Supp. 421, 424 (D.Mass.1977) (sole stockholder held personally liable for Medicare overpayments made to nursing home corporation). Indeed, the *Pisani* court acknowledged that the *Normandy House* doctrine would also support piercing the corporate veil in that case. *Pisani*, 646 F.2d at 88.

Furthermore, the *Normandy House* doctrine is consistent with language in prior and subsequent Supreme Court cases. *See, e.g., Schenley Corp. v. United States*, 326 U.S. 432, 437, 66 S.Ct. 247, 249, 90 L.Ed. 181 (1946) ("... corporate entities may be disregarded where they are made the implement for avoiding a clear legislative purpose ..."); *First National City Bank v. Banco Para El Comercio*, 462 U.S. 611, 630, 103 S.Ct. 2591, 2602, 77 L.Ed. 2d 46 (1983) ("... [this] Court has consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies ...").

The National Housing Act was intended to benefit individuals living in inadequate housing, not commercial developers. Housing Act of 1949, Section 2, 42 U.S.C.A. § 1441. *See also United States v. Winthrop Towers*, 628 F.2d 1028, 1036 (7th Cir.1980). HUD's deficiency loss in this case caused a loss to HUD's insurance fund, resulting in a diminution of assets that would otherwise have been available to pay other default claims, make emergency repairs, and advance funds to protect other HUD projects. Therefore, preserving the corporate entity in this case would

fly in the face of the clear legislative policy behind the NHA.[6] For all of the above reasons, we will pierce the corporate veil of Golden Acres.

## II.  PREJUDGMENT INTEREST

Plaintiff argues that it is entitled to prejudgment interest on the $466,760.54 for which defendants were found liable due to their violation of the Federal Priority Statute, 31 U.S.C. § 3713 (1982). 684 F.Supp. at 104. Plaintiff further states that while it is entitled to the interest as it accrued on each individual payment improperly made by defendants, calculation of such an award would be unduly burdensome; thus, plaintiff requests simply that prejudgment interest be assessed from December 8, 1981, the last date that an improper payment to the Capanos was made and the date defendants' debt became an ascertainable sum certain for purposes of this litigation. Plaintiff's Brief at 30. As of that date, plaintiff correctly points out, defendant owed plaintiff $466,760.54. *Id. See also* 684 F.Supp. at 104.

### A.  *Applicable Law*

■ The rule governing the interest which may be assessed on a judgment for nonpayment of a contractual obligation to the United States is not governed by state statute or local case law. *Royal Indemnity Co. v. United States*, 313 U.S. 289, 296, 61 S.Ct. 995, 997, 85 L.Ed. 1361 (1941). Thus, in the absence of a controlling federal statute, it is up to the federal courts to determine whether and to what extent prejudgment interest will be assessed. *Id.*

In the present case, no federal statute applies to the question of whether prejudgment interest should be granted. Because Plaintiff's claim arose before October 25, 1982, the statutory provision which prescribes the rate of interest on claims filed pursuant to the Debt Collection Act does not apply. 31 U.S.C. § 3717 (1982). Thus, as both parties have acknowledged, the is-

sue of whether to award prejudgment interest in this case is within this Court's discretion. *U.S. Dominator v. Factory Ship Robert E. Resoff*, 768 F.2d 1099, 1106 (9th Cir.1985); *United States v. Dollar Rent A Car Systems, Inc.*, 712 F.2d 938, 940 (4th Cir.1983).

### B.  *Analysis*

■ Federal courts have frequently awarded prejudgment interest to the Federal Government where the underlying claim is a contractual obligation to pay money. *See, e.g., Royal Indemnity*, 313 U.S. at 295–297, 61 S.Ct. at 997–998. *See also West Virginia v. United States*, 479 U.S. 305, 107 S.Ct. 702, 706, 93 L.Ed.2d 639 (1987). In fact, in one case relied on by plaintiff, which was decided before enactment of the Debt Collection Act, the United States Court of Appeals for the Third Circuit stated that: "[t]he general rule is that when the damages resulting from a breach of contract are ascertainable with mathematical precision, prejudgment interest is awardable as of right." *Pennsylvania Dep't of Pub. Welfare v. United States*, 781 F.2d 334, 341 (3d Cir.1986), (quoting *Eazor Express, Inc. v. International Brotherhood of Teamsters*, 520 F.2d 951, 973 (3d Cir.1975), *cert. denied*, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976), *rehearing denied*, 425 U.S. 908, 96 S.Ct. 1502, 47 L.Ed.2d 758 (1976)).

Plaintiff's argument notwithstanding, we note that awards of prejudgment interest as of right have not been universally embraced as the general rule. The language of the *Eazor* opinion quoted above has been criticized as being overbroad, inasmuch as it can be construed to "sweep away by implication the federal rule of discretion applied in a myriad of situations." *Nedd v. United Mine Workers of America*, 488 F.Supp. 1208, 1219 (M.D.Pa. 1980), *aff'd sub nom. Ambromovage v. United Mine Workers of America*, 726

---

**6.** Neither *Pisani* nor any subsequent case in this Circuit has relied exclusively on the *Normandy House* doctrine to justify piercing the corporate veil. Furthermore, we concede that the doctrine collapses to some extent into the *Kimbell*

*Foods* choice-of-law analysis. Nevertheless, the fact that refusal to pierce the corporate veil in this case would frustrate a clear legislative purpose is a persuasive, if not controlling, factor in our deliberations.

F.2d 972 (3d Cir.1984). The *Nedd* court stated that the quoted language of the *Eazor* opinion was "undermined" by another Third Circuit case, decided two months later, in which Judge Weis cautioned: "[i]nterest is not to be recovered merely as a compensation for money withheld but, rather, in response to considerations of fairness. It should not be imposed when its exaction would be inequitable," *Thomas v. Duralite*, 524 F.2d 577, 589 (3d Cir.1975) (citations omitted).

The *Nedd* court concluded, and we agree, that the discretionary rule set out in *Thomas* reflects the view followed in this Circuit more accurately than that set out in *Eazor. Nedd*, 488 F.Supp. at 1219. Furthermore, in affirming *Nedd*, the Third Circuit dismissed the *Eazor* quote as dictum and expressed its preference for the rule of *Thomas. Ambromovage*, 726 F.2d at 983 n. 30. As for the function of the *Eazor* quote in the *Pennsylvania* decision, it was dictum in that case as well, the court noting that the common law rule regarding prejudgment interest had been abolished by the Debt Collection Act. *Pennsylvania*, 781 F.2d at 341.

Similarly, the decision of the Supreme Court in *West Virginia* does not obligate us to grant prejudgment interest in the present case. The *West Virginia* Court decided to adhere to "the longstanding rule that parties owing debts to the Federal Government must pay prejudgment interest where the underlying claim is a contractual obligation to pay money." *West Virginia*, 107 S.Ct. at 706 (citation omitted). However, the Court also weighed countervailing factors, such as equitable considerations and federalism concerns, thereby indicating a willingness to deviate from the rule favoring interest. *Id.*

■ Thus, despite the existence of liquidated damages in this case, and the fact that the debts involved are owed to the Federal Government, we do not feel constrained to grant plaintiff's request for an assessment of prejudgment interest. On the contrary, whether to grant such an assessment is within our broad discretion. Nevertheless, having applied the analysis

developed in *Nedd* and applied in other cases decided in this Circuit, we conclude that such an award is proper in this case.

In *Nedd*, pensioned coal miners brought an action against their union on behalf of the pension fund, alleging breaches of trust under both Pennsylvania and federal law for failure to collect certain royalties. *Nedd*, 488 F.Supp. at 1211. After determining that it had discretion to grant or deny prejudgment interest under either law, the *Nedd* court laid out four basic factors to be weighed by a court considering a claim for prejudgment interest: "(1) whether the claimant has been less than diligent in prosecuting the action; (2) whether the defendant has been unjustly enriched; (3) whether an award would be compensatory; and (4) whether countervailing equitable circumstances militate against a surcharge." *Id.* at 1219–1220. We find these factors to be relevant and will apply them in our analysis of the present case.

As the *Nedd* court acknowledged, federal courts have agreed that prejudgment interest should not be granted when a plaintiff has shown a lack of diligence in pursuing his claim. *Nedd*, 488 F.Supp. at 1220. However, the *Nedd* court held that despite the fact that almost 19 years had passed since the plaintiffs' cause of action had accrued, an award of prejudgment interest might nevertheless be proper, since the delay could not be attributed to dilatory conduct on the part of either party. *Id.*

A similar holding was reached by the court in *Pension Ben. Guar. Corp. v. Greene*, 570 F.Supp. 1483, 1503 (W.D.Pa. 1983), *aff'd*, 727 F.2d 1100, (3rd Cir.1984) *cert. denied sub nom. Allen v. Pension Ben. Guar. Corp.*, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984). In *Pension*, the court held that, despite the fact that defendants had committed their first breach of their fiduciary duty to plaintiffs nine years before the action was filed, prejudgment interest would not be improper, since plaintiffs had not had an opportunity to review defendants' financial records until five years after the first breach, and presumably needed some time to sort out

those materials and uncover the irregularities. *Id.*

In the present case, defendants argue that prejudgment interest should be denied because plaintiff did not bring its action for violation of the priority statute until nearly ten years after HUD had discovered that defendants were "openly repaying themselves" instead of paying HUD. Defendants' Brief at 30. However, defendants cannot convincingly assert either surprise on their part or a lack of diligence on plaintiff's part as a basis for denial of prejudgment interest. Defendants were put on notice by April, 1979, at the latest, that plaintiff expected to be repaid. During that month, HUD wrote three letters questioning disbursements made by defendants and demanding repayment. Plaintiff's Motion for Summary Judgment, Appendix at A–48–52. Furthermore, HUD took legal steps to protect its rights, including instituting foreclosure proceedings in February, 1980. *See U.S. v. Golden Acres,* 520 F.Supp. 1073 (D.Del.1981). Thus, the delay in this case cannot be attributed to neglect on plaintiff's part and does not mandate a denial of prejudgment interest.

Preventing unjust enrichment and compensating the injured party—the second and third considerations enumerated by the *Nedd* court—are the two fundamental purposes for awarding prejudgment interest. *Nedd,* 488 F.Supp. at 1220. Only one of these two considerations is required to justify an award. *Id.* at 1221. The *Nedd* court declined to find unjust enrichment because the defendants in that case never had enjoyment of the uncollected royalties; however, the court suggested that mere use or possession of the money by the defendants might have been sufficient to support a finding that defendants had been unjustly enriched. *Id.* Similarly, in *Pension,* 570 F.Supp. at 1503, the court held that defendants had been unjustly enriched by the "use-value" of misappropriated pension fund money, despite the fact that they never actually possessed any of it, since the money was used to keep afloat companies which employed defendants as their main officers.

Judged by the broad "use-value" standard suggested in *Nedd* and applied in *Pension,* defendants in this case were clearly unjustly enriched by their failure to pay HUD promptly. We have already determined that defendants were in possession of the money owed to HUD. 684 F.Supp. at 102. Thus, an award of prejudgment interest would be justified.

Compensation of the victim may present another justification for an award of prejudgment interest. *Nedd,* 488 F.Supp. at 1220. This consideration stems from the notion that the "inherent income-producing ability of money cannot be separated from the money itself." *Nedd,* 488 F.Supp. at 1221 (quoting Recent Developments—Prejudgment Interest of Damages: New Application of an Old Theory, 15 Stan.L.Rev. 107, 109 (1962)). But the *Nedd* court warned that some courts have been reluctant to grant prejudgment interest where it would result in a "windfall" to the claimant. *Id.* For example, in *Norte & Co. v. Huffines,* 416 F.2d 1189 (2d Cir.1969), *cert. denied sub nom. Muscat v. Norte & Co.,* 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970), a case relied on by the *Nedd* court, the Court of Appeals for the Second Circuit remanded in part for reconsideration of an award of prejudgment interest in a derivative suit based on a fraudulent exchange of stock by corporate fiduciaries. The Second Circuit instructed the court below to take into account whether director-defendants, by their wrongdoing, had caused the corporation to pass up any reasonably available alternatives to use the shares which defendants had sold at below market value. *Norte,* 416 F.2d at 1191.

However, the Third Circuit has expressly rejected the windfall theory of *Norte,* stating that what the claimants in such cases would have done with the monies owed them is irrelevant for the purposes of granting prejudgment interest:

Although the beneficiaries would have probably spent the money on consumption rather than invested it, they would still have benefitted from the "time-value" of having that money at the time the royalties were due, rather than after

twenty-one years of litigation. In the market, consumers must be compensated for delaying consumption. This compensation is reflected in the interest rate ... There is no principled reason for compensating parties who generally find the rate of compensation sufficient to deter consumption (investors) and denying compensation to parties who find that rate insufficient (consumers).

*Ambromovage*, 726 F.2d at 983 n. 32.

In the present case it is indisputable that plaintiff was denied the money owed it; plaintiff was deprived of the benefit of having the money at the time it was due, rather than after eight years of negotiation and litigation. Thus, according to the reasoning of the Third Circuit in *Ambromovage*, plaintiff is entitled to compensation in the form of prejudgment interest.

On the subject of compensation, we note that an award of prejudgment interest in this case is entirely consistent with the requirement that the Federal Priority Statute be liberally construed in order to effectuate its purpose: securing an adequate public revenue to sustain the public burden. *United States v. Emory*, 314 U.S. 423, 426, 62 S.Ct. 317, 319, 86 L.Ed. 315 (1941). Such an award will also assure that money appropriated by Congress to accomplish the goals of the National Housing Act is devoted to the service of the intended beneficiaries, tenants, rather than to that of commercial developers. *See Riles v. Bennett*, 831 F.2d 875, 877 (9th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1291, 99 L.Ed.2d 501 (1988); *cf. United States v. Winthrop Towers*, 628 F.2d 1028, 1036 (7th Cir.1980).

Finally, the *Nedd* court suggested that courts deciding whether to grant prejudgment interest should consider whether any equitable considerations militate against such an award. *Nedd*, 488 F.Supp. at 1223. This is not to say that whether interest may be awarded depends on a full-blown balancing of the equities between the parties; however, equitable considerations, such as laches, may bar an otherwise valid claim for interest. *West Virginia*, 107 S.Ct. at 706 n. 3.

In *Nedd*, the district court concluded that defendants' interest-free loans to plaintiffs during the period of indebtedness offset the impact of their misdeeds, and denied plaintiffs' claim for prejudgment interest for that reason. *Nedd*, 488 F.Supp. at 1223–1224. The Third Circuit held that this denial did not constitute an abuse of discretion. *Ambromovage*, 726 F.2d at 984. In *Pension*, on the other hand, where no such loans were made, the court concluded that "all equitable considerations, that the Court can think of, weigh in favor of prejudgment interest." *Pension*, 570 F.Supp. at 1504.

In the present case, defendants have not pointed to any equitable considerations that weigh against an award of prejudgment interest. We are certainly at a loss to find any. Defendants' sole objection to such an award is based on what it terms plaintiff's "neglect," and we have already dealt with that issue. Thus, we hold that an assessment of prejudgment interest is proper here.

## C. *The Amount to be Awarded*

Neither of the parties has been able to point us to any relevant common law authority suggesting specific formula for setting the amount of prejudgment interest to be assessed. We note that this valuation is usually left to the discretion of the trial court. *See, e.g., West Virginia*, 107 S.Ct. at 705 (affirming remand by the Fourth Circuit for an award of such prejudgment interest as the district court deemed reasonable). Generally speaking, such interest should be awarded at a rate which will compensate claimant for the loss of the use of money due as damages from the time the claim accrued until judgment is entered. *Id.* at 706 n. 2 (citation omitted).

Defendants argue that any grant of prejudgment interest made in this case should be measured only from the filing of this suit on March 21, 1985. Such a limited award is clearly inadequate in light of the language of *West Virginia* quoted above. Instead, as plaintiff correctly argues, interest should be measured from the time plaintiff's claim accrued. Certainly plain-

tiff's claim accrued no later than December 8, 1981, the date of defendants' last payment. Since plaintiff has requested interest be assessed from that date, that is the date we shall deem plaintiff's claim to have accrued.

As for the rate of interest to be applied, defendants ask that interest be awarded at a rate of 6%, arguing that plaintiff's cause of action arose prior to 1980; 6% was the legal rate of interest under Del.Code Ann. tit. 6, section 2301 (1974) prior to 1980; and application of the pre–1980 version of 28 U.S.C. section 1961 requires us to apply state law regarding interest, where the federal statute giving rise to the claim is silent regarding interest, as is the Priority Statute. Defendants' argument lacks merit for several reasons. First of all, plaintiff's cause of action has been deemed to have accrued on December 8, 1981, and thus if we were bound by any statutory interest rate, it would be the rate effective as of that date. Furthermore, even if the Delaware statute in effect in 1980 were to be applied, the result would not be an award of 6% interest: the statute allowed for a rate of up to 9% where, as here, the parties had expressly provided for an award greater than 6% in the contract; and the statute was amended in 1980 to peg the legal rate of interest at 5% over the Federal Reserve discount rate, an amount well above 6%. Finally, 28 U.S.C. section 1961 applies only to postjudgment interest.

Instead, we shall assess interest at a rate of 7% per annum. Most persuasive among plaintiff's arguments in support of this rate is the fact that the 7% rate was specified in the original mortgage note. Motion for Summary Judgment, Appendix at A–15. If defendants had honored the mortgage note, plaintiff would have received a 7% return on the principal payments. Thus, an award of 7% interest would properly compensate plaintiff without unduly punishing defendants. Further supporting our decision is the fact that HUD regulations under the Debt Collection Act currently provide for prejudgment interest on collections at a rate of 7%, 24 C.F.R. § 17.72(e) (1987); and that the present federal funds rate is now approximately 7%. Plaintiff's Brief at 30.

We share the plaintiff's position that prejudgment interest in this case should not be compounded. The prejudgment interest statute for federal debt collection, 31 U.S.C. section 3717 (1982), does not call for accrual of interest on interest or compounding. While that statute does not apply to the present case, see supra, we take this fact as a persuasive expression of legislative intent.

Interest on $466,760.54 from December 8, 1981 to June 7, 1988 at the rate of 7% per annum is $212,376.05 with a current daily interest factor of $89.27. This amount was calculated by taking the $466,760.54 principal and computing simple interest at the rate of 7%. Final judgment should thus be entered against defendants under Count III of the complaint for $679,136.59, comprising principal plus interest.

### D. *Conclusion*

The foregoing facts indicate that the defendants abused the corporate form to deprive HUD of monies owed it. The defendants put off HUD's collection efforts to pay themselves from Golden Acres' rents. Because their actions have caused the Government loss by creating and increasing the outstanding mortgage deficiency, the defendants should bear responsibility for the debts they have created, not the American taxpayers.

We hold that the corporate veil of Golden Acres is pierced, and defendants are to be held individually liable for the deficiency loss caused the United States. Mario Capano, who singlehandedly controlled the corporation; Joseph Capano, director of the corporation in name only, who approved of Mario's actions in operating the corporation; and J.L. Capano, Inc., the corporation that was technically the sole shareholder of Golden Acres, are declared the alter egos of Golden Acres.[7] In addition, we hold that

---

7. Defendants argue that it is necessary for us to pierce the corporate veils of both J.L. Capano, Inc. and Golden Acres, Inc. to hold Mario and

Joseph Capano personally liable for the debts of Golden Acres. This argument is incorrect as a matter of law. The alter ego doctrine may be

the defendants are liable for prejudgment interest on the amount for which they were found liable for violation of the Federal Priority Statute, 31 U.S.C. § 3713 (1982).

applied even where defendants personally own no stock in the corporation, so long as the necessary action and total control have been established. *Krivo Industrial Supply Co. v. National Distill. & Chem. Corp.,* 483 F.2d 1098, 1104 (5th Cir.1973).

In the alternative, we hold that plaintiff has established a sufficient factual basis for piercing the corporate veil of J.L. Capano, Inc. under the *Pisani* analysis.