**TRANS-WORLD INTERNATIONAL, INC.,** an Ohio corporation; and International Merchandising Corporation, an Ohio corporation, Plaintiffs,

v.

**SMITH-HEMION PRODUCTIONS, INC.,** a California Corporation; Jackson Communications, Inc., a Delaware corporation; Jackson Jubilee, Inc., a New Jersey corporation; Joseph Iny, an individual; Weiss/Watson, Inc. a/k/a WWI Corporation, a New York corporation; and Caribiner Group Corporation, a New York corporation; and DOES 1 through 100, Defendants.

and related cross–actions.

No. CV 94–6960–LEW.

United States District Court, C.D. California.

July 28, 1997.

John A. Lawrence, Brian M. Colligan, William J. Briggs, II, Richman, Lawrence, Mann, Greene & Chizever, Beverly Hills, CA, for Smith–Hemion Productions, Inc.

Steve Cochran, Zia Modabber, Carolyn Hampton, Katten, Muchin, Zavis & Weitzman, Los Angeles, CA, for Michael Jackson.

R. Brian Oxman, Oxman & Jaroscak, Santa Fe Springs, CA, for Katherine, Joseph, Jermaine, Tito, Rebbie, Randy, Jackie and Marlon Jackson.

## MEMORANDUM OF DECISION AND ORDER GRANTING JUDGMENT IN FAVOR OF CROSS–DEFENDANTS

LAUGHLIN E. WATERS, Senior District Judge.

### I. Background

The background to this action is by this time well known to the parties and the Court. In or about April of 1992, various members of the Jackson family conceived of the creation of a family-owned corporation. Through the work of Robert Petrallia, an entrepreneur and business partner of several members of the Jackson family, together with cross-defendant Jermaine Jackson, as well as several other individuals, Jackson Communications, Inc. ("JCI") was incorporated in 1992.

Jermaine Jackson and his mother Katherine,[1] together with Petrallia, conceived of a live televised show ("the Show") in which all of the performing Jacksons, with the exception of LaToya Jackson, could showcase their talents. JCI developed the plan for the Show and enlisted Trans World International/International Management Group ("TWI/IMG") to aid in its planning and execution on December 11, 1993.

Through the efforts of Jermaine, cross-plaintiff Smith–Hemion Productions, Inc. ("Smith–Hemion") was engaged to produce the event. JCI entered into a license agreement with NBC through which NBC would broadcast the Show, and JCI entered into a production agreement with Smith–Hemion under which Smith–Hemion would produce the Show. Smith–Hemion was to contract directly with vendors including the venue, the crew, paid talent, and the providers of all equipment. NBC was to pay a license fee to JCI over a period of time. JCI was to pay Smith–Hemion monies sufficient to cover all commitments made by Smith–Hemion, as well as $375,000 as Smith–Hemion's fee. Smith–Hemion, JCI and TWI/IMG began to work towards the creation of the Show, and NBC periodically released portions of the license fee to JCI.

The license agreement provided that Michael would perform at the Show. After some months of uncertainty over whether Michael intended to appear at the Show and over what type of appearance by him would satisfy the network, NBC indicated that his mere appearance to present awards would suffice, and Michael signed a typewritten letter indicating his intent to appear at the Show on December 11, 1993. At this point, Smith–Hemion finalized its commitments to various vendors.

In November, 1993, Michael declared his unequivocal intention not to appear at the

---

1. In the interest of brevity and clarity, the Court will refer to each of the cross-defendants, Michael, Katherine, Joseph, Rebbie, Jackie, Jermaine, Tito, Marlon, and Randy Jackson, individually by first name throughout this memorandum. Surname exclusion, as necessitated here, exudes casualness; however trivial, no disrespect is meant by such reference. Moreover, the Court will refer collectively to the defendants in the alter ego action—all the aforementioned individuals except Michael—as the "family cross-defendants."

taping of the Show. As a result, NBC cancelled the Show and refused to pay to JCI the balance of the license fee. Because Smith–Hemion had made irrevocable contracts regarding the Show's production, Smith–Hemion was left with well over $1 million in debts that were not covered by the Show's projected revenues. Moreover, Smith–Hemion was not paid its $375,000 fee.

Pursuant to an agreement between JCI, NBC and Smith–Hemion, all of whom wished to retrieve the costs expended in preparation for the December Show and to make a profit, the Show was rescheduled for February 19, 1994, in a different venue, in the hope that the rescheduled Show would be successful. The Show went forward with Michael as well as other talent. The Show, did not, however, prove a financial success. JCI failed to pay the production costs and fees due to Smith–Hemion under the production agreement.

Smith–Hemion filed an action in Superior Court against JCI for the monies due to Smith–Hemion under the production agreement. JCI did not defend the action, and a default judgment was granted in favor of Smith–Hemion and against JCI. Smith–Hemion was not, however, able to collect on this judgment.

Concurrently, TWI/IMG filed the instant action in interpleader in this Court. This Court assumed supplemental jurisdiction over numerous cross-claims and counterclaims in the interpleader action. The interpleader and most of the supplemental claims were settled or otherwise disposed of prior to the August 1996 trial date. The claims remaining as of the August, 1996, trial were: 1) Smith–Hemion's cause of action against Michael for promissory estoppel; 2) Smith–Hemion's cause of action against the family cross-defendants for fraud; and 3) Smith–Hemion's cause of action against the family cross-defendants claiming that each of them is the alter ego of JCI, and is therefore personally liable for satisfying JCI's judgment debt to Smith–Hemion.

After a trial commencing in August 1996, in which the fraud claim was tried to a jury and the other claims were tried to the Court, the jury was unable to reach a consistent verdict and the Court declared a mistrial on all claims. *Trans–World Int'l v. Smith–Hemion Prod.*, 952 F.Supp. 667 (C.D.Cal.1996). Retrial was set for February 6, 1997. On the scheduled first day of trial, the parties, with the intent to avoid the cost and time of a retrial, stipulated that 1) Smith–Hemion would dismiss its fraud claims with prejudice, and 2) the parties would agree to submit to decision and judgment by this Court on the remaining claims based solely upon the record created during the original trial. The parties agreed in open court to the terms of this stipulation, and submitted a stipulation and proposed order which was entered by the Court.

## II. Findings of fact[2]

Based on the evidence presented at trial, the Court specifically finds that:

1. At no time was Jermaine Jackson or any other member of the Jackson family authorized to make any commitments or other representations on behalf of Michael with respect to Michael's appearance on the Show.

2. At no time did Smith–Hemion or any of its representatives believe that Jermaine or any other cross-defendant was authorized to make legally binding commitments or representations on behalf of Michael.

3. Both Katherine and Jermaine indicated to Michael on several occasions that they wanted him to appear on the Show. On at least one occasion, Jermaine told Michael that the family would be "penalized" if he did not commit to appearing on the Show.

4. Jermaine drafted a typewritten letter ("the Letter") for Michael's signature indicating Michael's intent to attend the Show. Michael signed the Letter, dated September 4, 1993, and caused the signed Letter to be delivered to Jermaine Jackson.

2. To the extent that the conclusions of law set forth in Section III below rest upon factual findings that have been inadvertently omitted from the following numbered findings of fact, but which nonetheless are supported by the record, such facts are implicitly adopted by the Court.

Moreover, any finding of fact that the Court has erroneously termed a conclusion of law shall be deemed a finding of fact, and any conclusion of law that the Court has erroneously termed a finding of fact shall be deemed a conclusion of law.

5. The Letter indicated unequivocally that Michael would appear at the December Show and would present two awards.

6. No salutation appeared at the top of the Letter; thus, the Letter was not on its face directed to any particular individual or entity.

7. The Letter was not written to Smith–Hemion, nor did Michael transmit the Letter to Smith–Hemion or direct that it be transmitted to Smith–Hemion.

8. Smith-Hemion did not ask Michael or any agent or attorney of Michael for the Letter.

9. Smith-Hemion did not in any way negotiate with Michael or with any agent or attorney of Michael to secure a promise from him.

10. No evidence supports the claim that Michael understood that the purpose of the Letter was to satisfy Smith–Hemion's need for such a letter.

11. Michael's promise to appear, memorialized in the Letter, was not made with the intention to benefit Smith–Hemion.

12. Gary Smith, a principal of Smith–Hemion, learned of the Letter's existence and received a copy of it from Jermaine.

13. Smith did not believe that the Letter was directed to Smith–Hemion in particular, but believed that it represented a firm commitment by Michael to appear at the Show.

14. After Smith learned of the Letter, Smith–Hemion began to make substantial irrevocable commitments with respect to the Show.

15. Smith-Hemion's decision to make irrevocable commitments with respect to the Show's production was a response to Michael's letter.

16. Smith-Hemion made these commitments because of its belief that the Letter reflected Michael's intent to appear at the Show.

17. At no time prior to Smith's learning of the Letter's existence did any representative of Michael, including either of Michael's personal managers, Sandy Gallin and Jim Morey, promise that Michael would appear at the Show. After Smith received the Letter and began making commitments, but not before Smith's receipt of the letter, both Gallin and Morey confirmed that Michael would appear at the Show.

18. Gallin and Morey are the personal managers of Michael. They are not licensed as talent agents under California law. Because they are not licensed talent agents, Gallin and Morey could not legally commit Michael to appear at the Show.

19. Smith-Hemion was at all times aware of both the law forbidding non-licensed individuals from making such commitments and the fact that Gallin and Morey were not licensed talent agents. Moreover, Michael at no time represented to Smith–Hemion that Gallin and Morey were agents authorized to commit him to appear, nor was he aware of any conduct on the part of Gallin or Morey that may have led Smith–Hemion to so believe. Gallin and Morey were therefore not apparent or ostensible agents for the purposes of Smith–Hemion's dealings with Michael.

20. No representations made by Gallin and Morey caused Smith–Hemion to make or to finalize commitments regarding the Show's production. First, the timing of Smith–Hemion's finalization of its commitments leads to the conclusion that Smith–Hemion did so in response to its receipt of the Letter, and not in response to any other affirmation of Michael's intent to appear. Second, Smith and other representatives of Smith–Hemion at all times knew that Gallin and Morey did not have legal authority to make a promise on behalf of Michael.

21. Prior to his signing the Letter, Michael was informed by Jermaine and by Katherine that his appearance at the Show was considered extremely important by various family members.

22. At no time was Michael informed by anyone that his presence or performance at the Show was essential to the commitment by either Smith–Hemion or NBC to produce the Show. Neither Michael nor any agent or attorney of his was made aware, prior to his decision not to appear, of the clause in the NBC license agreement requiring that he perform at the Show.

23. On or about June 11, 1993, JCI and Smith–Hemion entered into a production agreement which provided, among other features, that Smith–Hemion would executive produce, produce and direct the Show for a fee of $375,000.

24. Smith-Hemion's agreement with JCI was a "pay-or-play" agreement, under which JCI was obliged to compensate Smith–Hemion for its production expenses whether or not the Show went forward. Smith–Hemion intentionally negotiated the contract to contain such an agreement. Smith–Hemion thus intended that in the event of cancellation, JCI would pay Smith–Hemion's production expenses.

25. Smith-Hemion did not act with ordinary prudence in relying on the Letter as a legally binding commitment by Michael to appear on the Show, given that the Letter was, on its face, not directed to or for the benefit of Smith–Hemion, and that no other circumstances implied that Michael had written the letter to or for the benefit of Smith–Hemion.

26. Michael failed to appear at the Show, without excuse. He notified Smith–Hemion that he would not appear in or about late November of 1993.

27. After Michael notified Smith–Hemion that he would not appear on the Show, NBC caused the Show to be cancelled.

28. Upon cancellation of the Show, Smith–Hemion owed approximately $1.175 million to various parties, and possessed no Show revenue from which to pay these expenses. JCI also owed Smith–Hemion its fee of $375,000. JCI failed to pay Smith–Hemion the money owed.

29. At no time prior to Michael's notification to Smith–Hemion that he would not appear at the Show did either Michael or Smith–Hemion contemplate that Michael would be responsible for paying production expenses in the event of Michael's failure to appear at the Show.

30. Both JCI and Smith–Hemion believed that rescheduling the Show for a later date would be in their best interests. By December 2, 1993, Michael had expressed an unequivocal intent to appear at a rescheduled Show in February if such a show were produced. This intent was manifested in a let-ter from his counsel, Howard Weitzman, dated December 2, 1993.

31. On December 20, 1993, Smith–Hemion's counsel Jeffrey Ingber conveyed a letter to Michael threatening to file a lawsuit against him.

32. Smith-Hemion did not, at any time subsequent to Michael's informing Smith–Hemion that he would not appear at the December Show, intend to extinguish or modify Michael's obligations under any purported agreement to appear at the December Show.

33. JCI was incorporated in 1992 as a Delaware corporation.

34. JCI's application for authority to conduct business in the state of New Jersey was signed by Robert Petrallia as Chairman and CEO of JCI.

35. Following is a list of all shareholders of JCI and the number of shares owned by each, according to JCI's corporate records: Robert Petrallia, 909.0909 shares; John Heine, Katherine Jackson, Joseph Jackson, Rebbie Jackson, Jackie Jackson, Jermaine Jackson, Tito Jackson, Marlon Jackson; and Randy Jackson, Michael Jackson, LaToya Jackson, Janet Jackson, and Richard Hampton, 454.545454 shares each; Richard Benanchietti, 300 shares; Kenneth Johnathan, Jr., 300 shares; Frankie Harris, 100 shares.

36. Although the titles attributed to various officers and directors of JCI seem to have been mutable and not to be meaningful in terms of the way in which the corporation functioned, JCI held out at various times that Petrallia, Heine, Hampton, Johnathan, Coleman Hanover, and Jermaine, Tito, Rebbie, Katherine, and Joseph Jackson were directors of the corporation. Petrallia was President of the Board of Directors, and Jermaine was the Vice-President of the Board. Petrallia, Heine, Hampton, Johnathan, Benanchietti, and Jermaine and Tito Jackson were officers of the corporation; Petrallia held both himself and Jermaine out as the Chief Executive Officer, or CEO, of the corporation in various contexts.

37. At no time did JCI possess sufficient capital to cover the entire cost of producing the Show. Nonetheless, under the terms of

the NBC license agreement, and given the projected revenue of the December Show, JCI would likely have at some time possessed sufficient funds to cover the projected cost of producing the December Show, had the Show gone forward as planned in December.

38. Smith-Hemion entered into its production agreement with JCI based on Smith's subjective impression that JCI would be a good business partner, as well as on the opinion of Smith and other Smith–Hemion representatives that the Show would be a success.

39. Smith-Hemion never in any significant way inquired into JCI's ability to cover the costs of producing the Show should the Show have been cancelled, despite the fact that JCI was obliged to pay these costs, as well as Smith Hemion's fee, even in the event of such cancellation.

40. JCI's April 20, 1993 financial statement was not materially inaccurate. The financial statement, including the notes to this statement, reflected that JCI's cash in hand as of March 31, 1993 was $22,278; that its receivables totalled approximately $330,-000, with the collectability of at least half of this sum speculative; that $200,000 in revenue that had been received from the Casino Association of New Jersey was refundable if the Show were not to go forward; and that JCI's planned joint venture involving the construction and operation of an entertainment complex in Las Vegas was still in negotiation.

41. JCI failed to keep adequate minutes at its meetings.

42. JCI, through the actions of its employee Stephen Zizmor, kept adequate records of its financial operations, including its corporate bank accounts as well as its receipts and disbursements.

43. JCI's corporate checking accounts were based in New Jersey, at First Fidelity Bank. All JCI expenses were paid from these accounts, except for certain payroll expenses which were paid out of a payroll account. All JCI revenue was deposited in these accounts. The balances of these accounts fluctuated over time, and at times amounted to as much as $200,000. Sources of revenue to JCI included money advanced to it under the Show

license agreement as well as money paid to it by other entities.

44. Only Petrallia and Heine had authority to sign, or did sign, corporate checks on behalf of JCI, and only Petrallia and Heine had the authority to make deposits into JCI's corporate accounts. No family cross-defendant ever signed a check drawn on any JCI corporate account.

45. No family cross-defendant, including Jermaine, was a signatory to any JCI corporate checking account or at any time was responsible for disbursing corporate funds from any such accounts.

46. Neither Jermaine nor any other family cross-defendant at any time directly disbursed or caused to be disbursed any of JCI's corporate funds to themselves or to any other party.

47. Neither Jermaine nor any other family cross-defendant was aware of the day-to-day financial operations or overall financial picture of JCI, nor were any of these individuals specifically aware of the existence or nature of JCI's corporate bank accounts.

48. During JCI's existence, JCI received significant revenue, which it deposited into its corporate accounts, and paid a variety of creditors with funds from its corporate accounts.

49. Each of the non-defendant shareholders in JCI—Petrallia, Hampton, Heine, Harris, and Johnathan—received "loans" from the corporation in significant amounts. Jermaine also received such "loans." These payments were intended to be treated as advances on compensation.

50. Several family cross-defendants other than Jermaine also received small payments from JCI. These payments were intended as compensation or reimbursements for expenses.

51. Jermaine and Lea Dabany, an individual whose relationship with JCI is unclear, opened a checking account at Coast Federal Bank in Encino, California, on or about June 7, 1993. "JCI" appears on the checks issued under this account. Jermaine brought a copy of JCI's articles of incorporation to the bank when he opened the account, and the

account was called a "partnership" account in bank papers. Jermaine's motive for bringing the articles of incorporation is unclear from the testimony.

52. All funds deposited in the Coast Federal account were Jermaine's personal funds at the time he made such deposits. All such funds originated in JCI's corporate accounts, and were loaned or given to Jermaine by JCI through the actions of JCI officer and shareholder Petrallia.

53. No officer or shareholder of JCI other than Jermaine specifically knew of the existence of the Coast account, although JCI's officers knew that JCI had conveyed the funds therein to Jermaine for his personal use.

54. No JCI debts were paid with funds from the Coast Federal account. Jermaine and Lea Dabany kept the account for their personal use.

55. The funds passing through the Coast Federal account were small in comparison with the total funds passing through JCI.

56. The Coast Federal account was not a JCI corporate account.

57. Petrallia signed the production agreement between JCI and Smith–Hemion on behalf of JCI.

58. Johnathan and Petrallia, and not any family cross-defendant, represented JCI in the contract negotiations between JCI and Smith–Hemion.

59. In negotiations regarding the Show's budget and JCI's payment obligations to TWI/IMG and to other entities, representatives of TWI/IMG dealt with Petrallia, Hampton, Johnathan, and Heine, and not with any family cross-defendant.

60. No family cross-defendant was directly copied with the execution copy of the Smith–Hemion/JCI agreement prior to execution of the agreement. Smith–Hemion was aware of this fact.

61. JCI's borrowing of funds from Joseph Iny, a businessman from New Jersey, to assist with covering the Show's production costs, and the terms of the agreement to do so, were negotiated by Petrallia and not by any family cross-defendant.

62. Smith-Hemion was at all times aware that neither Jermaine nor any other family cross-defendant was in control of JCI's day-to-day or overall finances.

63. The corporate structure of JCI was largely conceived by Petrallia.

64. JCI was originally designed, created and operated as a bona fide business enterprise.

65. Neither Jermaine nor any other family cross-defendant was the "dominant shareholder" of JCI. These persons did not individually or collectively control the finances or day-to-day operation of the company.

### III. Conclusions of law

### A. Smith-Hemion's claim against Michael

**1. Michael has failed to establish that any obligation of his was extinguished by an accord and satisfaction or by a novation**

■ Michael has failed to establish that any agreement was extinguished by an accord and satisfaction or by a novation. "An accord is an agreement to accept, in extinction of an obligation, something different from or less than that to which the person agreeing to accept is entitled." Cal. Civ. Code § 1521 (West 1997). "Acceptance, by the creditor, of the consideration of an accord extinguishes the obligation, and is called satisfaction." Cal. Civ. Code § 1523 (West 1997). Under this principle, if Michael agreed to participate in the rescheduled February show in exchange for new consideration—in this case, Smith–Hemion's alleged promise not to pursue legal claims against Michael based on his failure to appear at the original Show—Michael's obligations under the original contract would be extinguished. This claim fails because prior to Ingber's December 20, 1993 letter threatening to sue Michael and subsequent discussions regarding the details of the rescheduled Show, Michael had already unequivocally formed and expressed his intention to appear at a rescheduled February show. This intention is evidenced by the letter of December 2, 1993 written by his counsel Weitzman. Michael's decision to attend the rescheduled show thus could not have been made in consideration of any promise not to sue made by Smith–

Hemion on or subsequent to December 20. Despite Ingber's testimony at trial tending to show that agreements entered into with JCI were entered into in exchange for Smith–Hemion's agreement not to sue, Michael unquestionably intended to appear at the February Show prior to Ingber's communications with any party regarding a lawsuit.

■ Novation is the substitution by agreement of a new obligation for an existing one. Cal. Civ.Code §§ 1530, 1532 (West 1997). Because a novation is considered a new contract, it is subject to the law governing contracts. Cal. Civ.Code § 1532 (West 1997). Thus, a new consideration is necessary. As set forth in the previous paragraph, no new consideration was offered at the time that Michael expressed his intent to appear at the February Show. Moreover, novation requires an intent to substitute a new obligation for the old one. *Wells Fargo Bank v. Bank of America,* 32 Cal.App.4th 424, 432, 38 Cal. Rptr.2d 521 (1995). Given the timing of Weitzman's letter, Michael's decision could not have been made pursuant to an intent by both parties to extinguish any prior legal obligation by Michael to appear at the December Show, because there is no evidence that representatives of Smith–Hemion and Michael had discussed the filing of a lawsuit prior to Michael's commitment to attend the February Show.

Because neither new consideration nor intent to substitute a new obligation is present here, the Court finds that Smith–Hemion and Michael did not enter into an accord and satisfaction or a novation.

### 2. Smith-Hemion has not shown that Michael is liable for promissory estoppel

#### a. Background on promissory estoppel

■ Ordinarily, a promise may be legally enforceable only where it is supported by consideration. Nonetheless, a promisee may, under certain circumstances, obtain the enforcement of a promise not supported by consideration in order to prevent an injustice. California courts generally follow section 90 of the Restatement Second of Contracts, which provides that a court may hold a promise enforceable under the promissory estoppel theory where the promisee shows (1) a promise, (2) that the promisor should reason-

ably expect to induce the promisee's reliance, (3) that the promisor's action did in fact induce such reliance, and (4) that injustice can be avoided only by enforcement of the promise. *Smith v. City of San Francisco,* 225 Cal.App.3d 38, 48, 275 Cal.Rptr. 17 (1990).

Federal courts applying California promissory estoppel law have identified another element that the promisee must prove: that the promisee's reliance have been reasonable under the circumstances. Thus, under the Ninth Circuit's application of California law, in order to establish a right to recovery based on promissory estoppel, "a promisee must show (1) the existence of a promise, (2) that the promisor reasonably should have expected to induce the promisee's reliance, (3) that the promisee actually induce[d] such reliance, (4) that such reliance is reasonable, and (5) that injustice can be avoided only by enforcement of the promise." *DeVoll v. Burdick Painting, Inc.,* 35 F.3d 408, 411 n. 4 (9th Cir.1994) (citation omitted).

While this Court must apply state law to contractual and quasi-contractual claims, typically the Court will attempt to follow holdings of the Ninth Circuit wherever possible. Here, as will be apparent, the result will be the same in either case because Smith–Hemion does not succeed in establishing either (a) the presence of an enforceable promise, or (b) that Michael should have reasonably expected to induce Smith–Hemion's reliance, assuming the existence of an enforceable promise. The Court does, however, include the additional element identified in the federal case law in its analysis, because it is implicit in the equitable principles underlying the doctrine of promissory estoppel that unreasonable reliance cannot be compensated. The Court concludes that Smith–Hemion failed to establish this element as well.

#### b. Michael did not make an enforceable promise to Smith–Hemion

As a factual and legal matter, neither Michael nor any of Michael's authorized representatives made a promise that may be enforced by Smith–Hemion. Instead, it is clear that (1) Jermaine, and not Michael himself, nor any authorized agent of Michael, nor

even Michael's personal managers Morey and Gallin, initially informed Smith–Hemion that Michael would appear, using Michael's letter to support his claim; and more importantly, (2) Michael made neither a commitment to Smith–Hemion, nor a commitment intended to benefit Smith–Hemion, but made a commitment only to Jermaine or to Katherine for their benefit, if to anyone at all.

■ Michael's letter was not a promise to Smith–Hemion or otherwise intended to benefit Smith–Hemion; moreover, the fact that Jermaine or some other family member may have used Michael's letter as proof of Michael's commitment does not make the letter a promise from Michael to Smith–Hemion. Several facts point to this conclusion. First, Michael's letter was not on its face directed to Smith–Hemion or to any representative of Smith–Hemion. Second, Smith–Hemion did not ask Michael or any of his representatives for the letter. Third, Smith–Hemion did not in any way negotiate with Michael to secure a promise from him. Fourth, there is no evidence that Michael understood that the purpose of the letter was to satisfy Smith–Hemion's need for such a letter.

■ Moreover, at no subsequent time did Michael or any of his authorized representatives make such a promise. The undisputed evidence showed that Gallin and Morey were not licensed talent agents and thus did not have the authority to make binding promises on behalf of Michael, *see* Cal. Lab.Code §§ 1700, *et seq.*, and that both Smith and Ingber were at all relevant times aware of both the applicable code provision and the managers' status.

■ Any statements by Gallin or Morey beyond the scope of their otherwise legal authority cannot be attributed to Michael unless Michael acted in a way such as to cause or allow Smith–Hemion to believe that the managers had such authority. *See Preis v. American Indemnity Co.*, 220 Cal.App.3d 752, 761, 269 Cal.Rptr. 617 (1990) ("[o]stensible authority must be established through the acts or declarations of the principal and not the acts or declarations of the agent"). First, as noted above, because Smith–Hemion was aware of the limits to the managers' legal authority, it is doubtful at best that any alleged actions or omissions by Michael could suffice to meet this burden. Second, the record does not suggest that Michael either acted in a way such as to imply that Gallin or Morey had such authority, or that he remained silent knowing that either Morey or Gallin had held himself out as having such authority. Consequently, any confirmation by Gallin or Morey of Michael's intent cannot substitute for an actual promise to Smith–Hemion by Michael or an authorized representative.[3]

In any event, it is apparent from the testimony of Morey that neither he nor any authorized representatives of Michael had discussed with Michael Michael's commitment to appear on the Show, prior to Smith's receipt of the Letter. In fact, the evidence showed that Smith initially informed Morey that Michael had committed to appear, and not the other way around. Thus, it is clear that Smith's belief that Michael had made a promise to Smith–Hemion was based on two things only: (1) Jermaine's apprising Smith of Michael's commitment to Jermaine and

---

3. Michael's argument stretches the case law too far by claiming that a promise to appear made by a personal manager is void *ab initio* with respect to any promisee. All the case law cited by Michael involves disputes between artists and their managers, and establishes that artists cannot be held to contracts negotiated on their behalf by nonlicensed persons. *See Waisbren v. Peppercorn Productions, Inc.*, 41 Cal.App.4th 246, 253–256, 258, 48 Cal.Rptr.2d 437 (1995), *review denied*, March 14, 1996; *Buchwald v. Superior Court*, 254 Cal.App.2d 347, 355, 62 Cal.Rptr.364 (1967). The Court can certainly conceive of cases in which it would be manifestly unjust to hold that an artist could simply void at will a promise by a personal manager to a third party promisee, and where a court would be correct to enforce such a

contract under a narrower construction of the cited cases that is supported by the law of agency. For example, where a promisee could have reasonably believed in the validity of a contract negotiated with a personal manager who, with the artist's knowledge, held himself or herself out as having such authority, the promisee might be able to enforce such a contract based on the ostensible authority of the manager. *See Preis v. American Indemnity Co.*, 220 Cal.App.3d at 761, 269 Cal.Rptr. 617 ("where the principal knows that the agent holds himself out as clothed with certain authority, and remains silent, such conduct on the part of the principal may give rise to liability" (citation omitted)). As set forth in the text, however, this is not such a case.

Katherine that Michael would appear; and (2) the Letter. Moreover, the existence of the Letter, and not any other factor, precipitated Smith–Hemion's finalizing of commitments.

■ Thus, any subsequent affirmations by Gallin or Morey could not have been more than confirmations of Michael's intent to appear, as originally manifested in his alleged oral commitment to Jermaine or other family members to do so and in the Letter. If Smith–Hemion relied on a promise to Smith in concluding that Michael would appear, it was a promise made by Jermaine or by some other family member, not by Michael or by any representative of Michael. If Smith–Hemion relied on any promise made by Michael, it relied on a promise from Michael to members of Michael's family, not to Smith–Hemion. Neither of these scenarios alone, nor the two together, satisfies the requirement that Michael have made a promise to Smith–Hemion.

The lack of a promise by Michael directly to Smith–Hemion distinguishes this case from *Bank of Fairbanks v. Kaye*, 227 F.2d 566 (9th Cir.1955) and *Morrison v. Home Savings & Loan Ass'n*, 175 Cal.App.2d 765, 346 P.2d 917 (1959), cited by Smith–Hemion in its papers. In *Kaye*, a foreclosure action, the plaintiff bank made a promise directly to defendant Kaye that payments by the third party Broussard would satisfy Kaye's obligation to the bank. When the bank reneged on this promise and attempted to foreclose on Kaye's property because Kaye had not made payments himself, a Court held that the bank's promise to Kaye was legally binding because of Kaye's reliance upon it. *Kaye*, 227 F.2d at 567–68.

Likewise, in *Morrison*, the defendant savings and loan association made a promise directly to plaintiff Morrison that it would lend money to a prospective purchaser of Morrison's home. In reliance on this promise, Morrison entered into a sales agreement with the prospective purchaser and also contracted to buy a new home from a third party. When the savings and loan reneged on its promise to Morrison, a court held the promise binding because Morrison relied on it in entering both contracts. *Morrison*, 175 Cal.App.2d at 771, 346 P.2d 917.

Thus, in both *Kaye* and *Morrison*, the promisor made a promise directly to the party attempting to enforce the promise. Here, by contrast, Michael made no promise to Smith–Hemion; consequently, an essential element of promissory estoppel is missing. Certainly, as in the cited cases, had Michael made a promise to Smith–Hemion, and were the other elements of promissory estoppel present, that promise would be enforceable despite the absence of consideration flowing from Smith–Hemion to Michael; such is the essence of promissory estoppel. But here, Smith–Hemion cannot get around the fact that Michael simply did not make a promise to Smith–Hemion.

In the absence of a promise to Smith–Hemion, only a promise made by Michael to another party that was made with the expressed intent to benefit Smith–Hemion would be enforceable. Assuming for the purpose of argument that Michael made an enforceable promise to Jermaine, to JCI or to some other party, Smith–Hemion was not the intended beneficiary of such a promise. The Court has already held, in its order entered March 14, 1996, that Smith–Hemion could not have been a third-party beneficiary of any promise made in the Letter for the purposes of a contract claim. Similarly, Smith–Hemion could not have been the third-party beneficiary of such a promise for the purposes of a promissory estoppel claim.

■ The requirement of a promise in a promissory estoppel claim is identical to the requirement of a promise in a contract claim; only the other side of the equation—the need for consideration flowing from the promisee to the promisor—distinguishes the two types of claim. *See Laks v. Coast Fed. Sav. & Loan*, 60 Cal.App.3d 885, 891, 131 Cal.Rptr. 836 (1976); *C.R. Federick, Inc. v. Sterling-Salem Corp.*, 507 F.2d 319, 322–23 (9th Cir. 1957) (Merrill, J., concurring) (citation omitted).

■ As held by this Court previously in granting Michael's motion to dismiss Smith–Hemion's third-party beneficiary contract claim, where no promise is made to a plaintiff, California law supports recovery on a contract claim only by an expressly intended beneficiary. Cal. Civ.Code § 1559 (West

1997); *Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d 819, 821–22 (9th Cir. 1985). Thus, only expressly intended beneficiaries may recover on a promissory estoppel claim. The pleadings and papers offered prior to trial proved no such intent. Given the benefit of the evidence at trial, the Court continues to find no such intent.

### c. Smith-Hemion did rely on Michael's appearance, although, as set forth above, not on a promise made by Michael

Although, as set forth above, Michael made neither a promise to Smith–Hemion nor a promise intended to benefit Smith–Hemion, there is no dispute, and the evidence supports the conclusion, that Smith–Hemion specifically relied on the Letter, and on Michael's stated intention to appear at the Show, when it finalized its commitments with respect to the production of the Show. *See infra*, Section III.A.2.f.

### d. Smith-Hemion's reliance was not reasonably foreseeable to Michael

 Smith-Hemion did not introduce any evidence that Michael at any time was informed that the Show would not go forward without his appearance. There is no evidence in the record to support the contention that Michael was ever informed that his presence was essential to the Show's production. Moreover, as set forth above, neither Michael nor any authorized representative of Michael promised that he would appear. Finally, Jermaine, and not Michael, any of Michael's representatives, or any representative of Smith–Hemion, drafted the Letter for Michael to sign and requested his signature on it. Michael's signing of the Letter at Jermaine's request does not support the conclusion that Michael believed that anyone other than Jermaine would rely on the Letter.

Similarly, assuming that the message that the family was about to get "penalized" [by NBC] was conveyed from Jermaine to Michael, there is no basis for an inference that Michael knew or should have known that Smith–Hemion was the party for whose benefit the Letter was drafted or would rely on it in any manner. The record does not in any way establish that Michael knew or should have known that the Show would be cancelled without his appearance; it is undisputed that he was unaware of the clause in the license agreement between NBC and JCI requiring his presence, and the only testimony offered as to whether he was specifically told that the Show would not go forward without him was his own testimony that he was not so informed. The record included additional evidence that Katherine indicated that his appearance was wanted *by the family, in order to improve the likely ratings* of the Show. In light of all the evidence, Smith–Hemion simply has not supported its contention that Michael knew or should have known that the Show would not have gone forward without him at the time that he stated his intent to appear.

Moreover, given his minor role in the production, the fact that he would not be paid, and his lack of artistic or creative input into the Show's production, Michael's testimony that he did not see himself as central to the Show's production is quite credible. Michael was not a party to any agreement, negotiation, or discussion about the Show's production, budget or content. In light of these circumstances, the Court must conclude that Michael neither knew nor should have known that Smith–Hemion would finalize its commitments based on his stated intent to appear.

### e. Any reliance by Smith–Hemion was not justifiable

 In light of the above analysis, Smith–Hemion's reliance on Michael's appearance was not justifiable; a person acting with ordinary prudence would not have relied upon Michael's actions or omissions.

Smith-Hemion contends in its papers, and Michael does not dispute, that Smith–Hemion began to finalize its commitments immediately following Smith–Hemion's receipt of the Letter from Jermaine. Smith–Hemion further contends that the Letter itself was the cause of Smith–Hemion's reliance; accepting this contention—a contention supported by the evidence—as true, Smith–Hemion's reliance was not justifiable. Ordinary prudence would caution strongly against a putative promisee relying on a letter which was: (1) procured through a third party—

Jermaine—who was not a representative of the promisor; (2) conveyed through that third party; (3) following no negotiations between the promisor or any agent or attorney of the promisor, on one hand, and the promisee or any agent or attorney of the promisee on the other; and (4) containing no evidence that the letter is addressed to the putative promisee rather than to some other party or no party at all.

Moreover, although it is apparent that Smith–Hemion "relied" on Michael's appearance for the Show to go forward, in the sense that the Show ultimately failed to go forward because of Michael's non-appearance, Smith–Hemion could not and did not rely on Michael as a source of compensation for its work in the event of Michael's non-appearance. Smith–Hemion intentionally entered into a contract with JCI that required JCI to pay Smith–Hemion for its production costs whether or not the show went forward. Thus, Smith–Hemion plainly contemplated that JCI would bear the burden of compensating it for its costs incurred if Michael did not appear. In short, were JCI solvent and capable of paying its debts, Smith–Hemion could not in any legal sense have been said to have undertaken work in reliance on Michael's appearance, since Smith–Hemion would now have been paid by JCI for all costs incurred. Clearly, the question of whether Smith–Hemion relied on Michael cannot turn on whether JCI ultimately lived up to its end of the contract between Smith–Hemion and JCI.[4]

**f. The interests of justice do not require the enforcement of a promise in this situation**

 There is no question that Michael could have, and should have, put more thought into his decision to state his intention to appear in the Show. The picture painted by the evidence is one of an individual who operates by whim, backing out of commitments and failing to take responsibility for the immense personal and commercial power that he has. He placed his personal

managers into an extremely awkward and difficult position, and his non-appearance at the December Show wreaked havoc on the plans made by all parties.

At the same time, Michael's statement of his intent to appear was gratuitous and was not offered by Michael to Smith–Hemion specifically. Smith–Hemion, as a commercial enterprise first and foremost, should have known the risks of entering into, for profit, a deal hinging entirely on a gratuitous commitment to a third party. While Smith–Hemion was undoubtedly a victim in some sense, its own contentions in this lawsuit support the conclusion that the Show was not of value without Michael's gratuitous appearance as well as the conclusion that Smith–Hemion stood to make a lot of money if the Show were successful.

Smith-Hemion, with principals who have been producing shows of this type for well over two decades, was represented by counsel throughout its dealings. It knew that the viability of the NBC license agreement was predicated from the outset on Michael's performing at the Show, and was unable to procure a commitment from Michael that he would in fact perform, or even appear, until after several months of planning had gone by and the Show's date was less than three months away. It did not require any written or oral promise from Michael or from any of Michael's agents or attorneys that he would appear, despite the fact that his appearance was to be gratuitous.

In sum, despite the behavior of Michael, which this Court cannot condone, the interests of justice do not require that Smith–Hemion be made whole. Unlike any other promissory estoppel cases reported in California, the party attempting to enforce the promise here is a powerful commercial enterprise that had the power and knowledge necessary to attempt to negotiate a contract with the putative promisor. To hold that Smith–Hemion should recover under the

---

4. This conclusion is bolstered by the opinion of the Los Angeles Superior Court in a related action that the production agreement between JCI and Smith–Hemion was not contingent upon any promise of Michael to appear. *Smith–Hemion*

*Prod. v. Michael Jackson*, No. BC 150600, at ¶ 7 (Los Angeles Superior Court, May 9, 1997) (sustaining Michael Jackson's demurrer without leave to amend).

facts presented in this case would be to eviscerate the law of contract in California.

### 3. Unclean hands

In light of the Court's conclusion that the elements of promissory estoppel are not present, the Court need not reach the question of whether unclean hands bar Smith–Hemion's recovery.

### B. Smith-Hemion's alter ego claims against the family cross-defendants

### 1. The Court rejects the family cross-defendants' contention that the dismissal with prejudice of the fraud causes of action disposes of the alter ego claims as well

The family cross-defendants argue that because Smith–Hemion has voluntarily dismissed its causes of action for fraud with prejudice, the issue of whether any family cross-defendant committed fraud has been adjudicated in favor of those individuals. The family cross-defendants further claim that because fraud is an essential element of an alter ego claim, Smith–Hemion's alter ego claims fail for lack of an essential element, or in the alternative that Smith–Hemion is judicially estopped from bringing the alter ego claim.

 As an initial matter, this argument fails because the family cross-defendants are estopped from asserting this position. In a stipulation and order signed by counsel for the family cross-defendants and approved and entered by the Court, all parties expressly agreed that in light of the parties' "desire to obtain a decision from the Court without the need for a retrial," Smith–Hemion dismissed its fraud claims with prejudice and the parties agreed to "submit to decision and judgment by this Court the Submitted Claims in this Action based solely upon the record created during the original trial." The family cross-defendants' contention that Smith–Hemion has given up its alter ego claims thus flies in the face of the plain terms of the stipulation and order. Both the parties and the Court approved the dismissal of the fraud claim and contemplated expressly that the Court would decide the alter ego claims "solely" on their merits as established by the evidence adduced at trial.

Having agreed to such a disposition, the family cross-defendants cannot seriously contend that the Court or the parties intended to, or must now, treat Smith–Hemion's dismissal of the fraud claim as conclusive of issues that were the subject of the trial. If the intention of the family cross-defendants was to create the bar for which they now argue, counsel for the family cross-defendants arguably committed fraud upon the Court and upon opposing counsel by signing the stipulation manifesting the family cross-defendants' intent that the alter ego claims be decided based on the trial record.

The family cross-defendants contend also that dismissal with prejudice of the alter ego claims, coupled with submission of the alter ego issue to the Court on its merits, somehow "deprive[s] [the family cross-defendants] of [their] right to a jury trial." This is absurd; had the family cross-defendants wished to litigate the fraud claims before a jury on the merits, their counsel could simply have refused to sign the stipulation and retried the case before a new jury. Having agreed in open court and in a written stipulation to (1) Smith–Hemion's request that it be allowed to dismiss its fraud claim with prejudice and (2) the submission of the record to the Court on the remaining claims, the family cross-defendants cannot now claim that their rights are being denied by the effect of that agreement.

 Second, the family cross-defendants' position on res judicata is erroneous. Res judicata does not cover a situation such as this one. Res judicata applies to bar a court from adjudicating an issue already decided in a different, prior lawsuit. *Bernhard v. Bank of America,* 19 Cal.2d 807, 810, 122 P.2d 892 (1942) ("Any issue necessarily decided ... is conclusively determined as to the parties or their privies if it is involved in a subsequent lawsuit on a different cause of action") The function of the doctrine is to avoid conflicting judgments by *different* courts. Clearly, here there is no risk of such a conflict because all orders to date on the claims at issue have been made by this Court.

 Finally, the family cross-defendants are wrong on their underlying contention:

1290

fraud is not an essential element of an alter ego claim under either California or Delaware law. While fraud is a factor to be considered, the absence of fraud is not dispositive. Under Delaware law, fraud is not necessary to pierce the corporate veil. *See United. States v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1107 (D.Del.1988) ("proof of plain fraud is not a necessary element in a finding to disregard the corporate entity" (citation omitted)). Similarly, under California law, the alter ego doctrine "does not depend on the presence of actual fraud," although "it is designed to prevent what would be fraud or injustice, if accomplished." *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal.App.2d 825, 838, 26 Cal.Rptr. 806 (1962).

■ Assuming for the purpose of this discussion that the issue of whether any family cross-defendant committed fraud has been conclusively determined in favor of the family cross-defendants (a position that, as discussed above, is erroneous in any event), the Court will not apply the doctrine of judicial estoppel as urged by the family cross-defendants. As noted by the family cross-defendants, "judicial estoppel is most commonly applied to bar a party from making a factual assertion in a legal proceeding which directly contradicts an earlier assertion made in the same proceeding or in a prior one." *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir.1990). Here, the rationale for such estoppel does not apply.

The only necessary conclusion from the dismissal with prejudice of the fraud claim is that the family cross-defendants did not commit the tort of fraud as defined by California law. This result in no way forecloses Smith–Hemion from showing that the family cross-defendants' behavior promoted injustice, that their actions may have been taken in bad faith, that they engaged in dishonesty, or that inequity would result by adhering to the corporate fiction, because none of these assertions directly contradicts the conclusion that they did not commit the tort of fraud.

Moreover, as discussed above, the Court would not in any case apply an equitable doctrine to assist the family cross-defendants in avoiding litigation of precisely the issue that they agreed to litigate. Such a result would be patently unfair to Smith–Hemion, which acted in a good-faith effort to avoid a retrial when it agreed to dismiss the fraud claims with prejudice.

**2. The family cross-defendants are not alter egos of JCI**

**a. Choice of law**

JCI is a Delaware corporation, and the actions of the family cross-defendants that form the basis of this lawsuit largely took place in California. Smith–Hemion contends that Delaware law applies to the alter ego claim (although it contends that it would prevail under either Delaware or California law), while the family cross-defendants appear to assume, without citation to any authority, that California law applies. The Court thus must engage in a choice-of-law analysis.

This Court applies the choice of law principles of the state of California. Smith–Hemion asserts that the California statute providing that "[t]he directors of a foreign corporation transacting intrastate business are liable to ... its ... creditors ... for ... violation of official duty according to any applicable laws of the state or place of incorporation or organization ..." applies to an alter ego claim. Cal. Corp.Code § 2116 (West 1997). The Court is not persuaded that this statute applies, because there has been no claim here of violation of any "official duty." In the context of corporate law, this phrase must refer to the duties owed to a corporation by its directors, the duties of care and loyalty.

■ The Court therefore must analyze the problem under the general principles of choice of law analysis in California. These principles require that the Court conduct a "governmental interest test." Under this test, the Court "must first consider whether the two states' laws actually differ; if so, [the Court] must examine each state's interest in applying its law to determine if there is a 'true conflict'; and if each state has a legitimate interest [the Court] must compare the impairment to each jurisdiction under the other's rule of law." *Arno v. Club Med. Inc.*, 22 F.3d 1464, 1467 (9th Cir.1994).

█ As set forth below in more detail, courts in both Delaware and California examine similar factors in determining whether an individual or corporation is the alter ego of another corporation. Ultimately, the question in both jurisdictions is whether a dominant shareholder should be held liable for misdeeds perpetrated by that shareholder in the name of the corporation. *See Harco Nat'l Ins. Co. v. Green Farms, Inc.*, 1989 WL 110537, \*4 (Del.Ch.), 15 Del. J. Corp. L. 1030, 1038 (1989); *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal.App.2d 825, 837, 26 Cal.Rptr. 806 (1962). The Court concludes, as set forth below, that, given the lack of proof that any family cross-defendant or combination thereof were controlling or dominant shareholders, and given the marked similarity between the factors considered under the law of each state, the tests do not differ in any material way for the purposes of the instant action. Consequently, the Court finds it unnecessary to engage in a choice-of-law analysis. Nonetheless, the Court will set forth below its application the law of each state in order to ensure a consistent result.

### b. The family cross-defendants are not alter egos of JCI under Delaware law

### i. The alter ego theory under Delaware law

█ As noted by Smith–Hemion in its papers, an alter ego analysis under Delaware law must start with "an examination of factors which reveal how the corporation operates and the particular defendant's relationship to that operation." *Harco Nat'l Ins. Co.*, 1989 WL 110537 at \*4, 15 Del. J. Corp. L. at 1038 (citation omitted). These factors include whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder. *Id.* at \*4–\*5, 15 Del. J. Corp. L. at 1038–39.

Ultimately, the last factor—whether the corporation served as a facade for the dominant shareholder—is generally dispositive: a distinguished Second Circuit panel has summarized the standard under Delaware law as "whether [the two entities] operated as a single economic entity such that it would be inequitable for this Court to uphold a legal distinction between them." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir.1995) (applying Delaware law and citing *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F.Supp. 1076, 1085 (D.Del.1990), *aff'd*, 932 F.2d 959 (3rd Cir.1991) (quoting *Mabon, Nugent & Co. v. Texas American Energy Corp.*, 1990 WL 44267, \*5 (Del.Ch.), 16 Del. J. Corp. L. 829, 838 (1990))). In fact, the Court has exhaustively searched the case law and found that in every reported case in which a shareholder was held an alter ego of a corporation, that shareholder has been proven to be "dominant," in the sense of both owning a majority of stock and controlling the corporation's general finances and day-to-day operations. *See, e.g., United States v. Golden Acres, Inc.*, 702 F.Supp. 1097 (D.Del.1988). The requirements that an alter ego be the dominant shareholder and that the two entities operated as a single economic entity make sense; for example, if inadequate capitalization or solvency alone were to lead to alter ego liability,' the corporate form would lose its advantage because a corporation's mere failure to satisfy a judgment could lead to individual liability on the part of shareholders. Similarly, inadequate recordkeeping or failure to observe formalities, while a possible indication of an alter ego situation, cannot themselves support an alter ego finding where such inadequacies do not reveal any underlying improper purpose or unity of interest between the defendant shareholder and the corporation.

As noted by the court in *Fletcher*, persuading a Delaware court to disregard the corporate entity is "a difficult task." *Fletcher*, 68 F.3d at 1458 (citing *Harco*, 1989 WL 110537 at \*4, 15 Del. J. Corp. L. at 1038). If such were not the case, every creditor of a corporation in which the directors were merely negligent in observing corporate formalities might have an alter ego claim against individual shareholders of that corporation. Neither Delaware law nor equitable principles support such a result.

### ii. Application of Delaware law to this case

 Smith-Hemion has not shown that any family cross-defendant or combination of family cross-defendants on the one hand, and JCI on the other, acted as a single economic entity in any meaningful sense. Upon close examination of each "particular [cross-]defendant's relationship to the operation" of JCI, *see Harco*, 1989 WL 110537 at *4, 15 Del. J. Corp. L. at 1038, as well as the other factors considered under Delaware law, it is apparent that no family cross-defendant controlled or dominated the management of JCI or operated JCI as an economic entity indistinct from the family cross-defendants as individuals. Consequently, no family cross-defendant is JCI's alter ego under Delaware law.

Here, many of the factors set forth by Delaware courts may be present, such as inadequate capitalization and failure to observe corporate formalities. Nonetheless, no family cross-defendant was the "dominant" shareholder in any sense of the word. No family member, not even Jermaine, controlled either a majority of the stock, or the day-to-day operations of the corporation, or the general finances of the corporation. Moreover, because no family cross-defendant was in control of corporate funds, no family cross-defendant siphoned such funds. Finally, the corporation was solvent, receiving revenue and paying debts, for most of its existence until the Show was cancelled.

It is undisputed that Petrallia, Hampton, Heine and Zizmor, not any of the family cross-defendants, controlled JCI's bank accounts, kept receipts and disbursements journals, and generally ran virtually all aspects of the corporation from JCI's New Jersey offices. So, for example, Petrallia was the actual and sole signatory on all the checks drawn on these accounts that were received into evidence. Smith–Hemion presented no evidence that Jermaine was even aware of the activity in these accounts, much less a signatory on any checks drawn upon them.

The record of cancelled checks and the account registers on JCI's three New Jersey bank accounts provide powerful evidence, on a number of fronts, of the fact that JCI was not run for the sole benefit of the Jackson family members. First, a review of the registers and accounting journals kept by Zizmor, along with the testimony of every JCI official, reveals that these three accounts were in fact the corporate accounts of JCI, and the only such accounts. All JCI expenses were paid and all loans were made from these accounts; additionally, all revenue was deposited in these accounts.

The bank documents and account registers reveal that Petrallia and Heine, and not any cross-defendant, signed the checks for JCI; that Zizmor, and not any family cross-defendant, kept JCI's books; and that the corporation functioned for a substantial period of time as a true corporation, receiving revenue and paying expenses to a variety of creditors. Moreover, each of the non-defendant shareholders in the corporation received "loans" and/or "reimbursements" from the corporation in amounts as significant as the amounts of loans made to Jermaine and other defendants. In fact, Petrallia himself signed checks for well over $100,000 in "loans" to himself from the corporation—the majority of which were never repaid—over the period January 1, 1993 through August 28, 1994. The total of all sums disbursed to the family cross-defendants is far smaller than the total amount disbursed to the non-defendant shareholders. The record is thus inconsistent with Smith–Hemion's characterization of JCI as dominated by family members and run for their benefit.

Smith-Hemion relies heavily on the existence of Jermaine's Los Angeles "JCI" bank account to show that Jermaine misused corporate funds for his personal benefit. The record supports neither a finding that this bank account was truly a corporate account, nor a finding that Jermaine's use of the account tends to show that Jermaine was the alter ego of JCI. The evidence at trial did not reveal that Jermaine's Los Angeles account was used for any corporate business. The monies in this account, which represented just a small fraction of the funds that flowed through JCI's coffers, clearly did not constitute JCI's operating funds or other corporate accounts; the corporate accounts, as set forth above, were kept in New Jersey. The only sources of funds to this account were

checks written personally to Jermaine, and signed by Petrallia or Heine, as "loans" from the JCI corporate accounts; such funds were Jermaine's, whether or not the corporation was acting appropriately in writing him such checks, just as the sums "loaned" to Petrallia, Hampton, Heine, Harris, and Johnathan in precisely the same manner were their personal funds.

There is no evidence that any JCI officer besides Jermaine even knew of the existence of Jermaine's account. Jermaine received approximately $50,000 from JCI for his personal use, and deposited these sums in the Los Angeles bank account; all of this money was conveyed to Jermaine personally, in the form of checks made out to Jermaine, from JCI's corporate bank account in New Jersey, which was under the control of Petrallia and Heine. Jermaine's account contained only money deposited that had been "loaned" to Jermaine, and was not used for any true JCI purposes at all, but instead was treated consistently with Jermaine's contention that he believed that the funds in the account belonged to him personally. Thus, the evidence that Jermaine showed JCI's articles of incorporation to bank officers in opening the account, as well as the evidence that the name "JCI" appeared on the checks, is of no real import. Jermaine may have been confused, or may have had some improper purpose unrelated to the legal issues raised in this lawsuit, when he opened the Los Angeles account. Either way, his use of that account cannot be actionable by a third party such as Smith–Hemion as an improper use of the corporate form by Jermaine for Jermaine's personal benefit, because he was not in control of the accounts from which JCI's business was transacted and because the monies in the Los Angeles account had been disbursed to him personally with the approval of the directors and officers who did have control over the accounts.

In sum, the Court must conclude that Smith–Hemion has failed to prove that any family cross-defendant actually was a "dominant shareholder" or that the corporation functioned as a mere facade for Jermaine or for any other family member. This conclusion is bolstered by the facts that (1) other non-Jackson corporate officers took forgiven "loans" as compensation during the relevant period; (2) it is undisputed that the New Jersey accounts, not the California account, were the accounts in which payments on all JCI's receivables were deposited and the accounts from which the funds to cover all JCI's payables were withdrawn; (3) it is undisputed that no cross-defendant had either knowledge of or control over the New Jersey accounts; and (4) Jermaine offered undisputed testimony that when he signed documents and otherwise acted in a fiduciary capacity for JCI, he did essentially what non-defendant shareholders asked of him.

Smith–Hemion was well aware that while Jermaine was the creative force behind JCI's endeavors, others in fact controlled the corporation's legal and financial dealings. One illustration of this is the fact that the signature of Petrallia, as "chairman and CEO" of JCI, appears on the agreement between JCI and Smith–Hemion. Moreover, when Smith–Hemion negotiated this contract, JCI's representatives in the negotiation were not cross-defendants in this action, but were non-cross-defendant JCI shareholders Ken Johnathan and Petrallia. Smith–Hemion's attorney Ingber did not even directly send to any family cross-defendant the final execution copy of the agreement after negotiations ended and before the agreement was signed, although Ingber sent other JCI officers and shareholders such materials. To the extent that Smith–Hemion may not have been aware of the degree of control exercised by non-Jackson family members over the corporation, minimal research into the corporate structure of JCI would have made the situation clear.

Finally, the evidence establishes conclusively that while various Jacksons were involved in the creation of JCI, the corporate structure of JCI was conceived largely out of the mind of Robert Petrallia. Moreover, there exists ample evidence, including the original business plan developed by Petrallia, as well as testimony from several witnesses regarding discussions at the outset about the purposes and form of the corporation, from which to draw an inference that JCI was designed from the start as a bona fide business venture which was to involve many facets, and absolutely no evidence to the con-

trary. Thus, there is no basis for Smith–Hemion's contention that the corporation was in any way a mere sham created to shield the Jackson family from personal liability for personal ventures.

While the testimony paints a picture of an extremely poorly run company, and one in which various directors may arguably have breached their fiduciary duties to the corporation itself, it is impossible to fairly characterize any family cross-defendant as an alter ego of the company based on these facts. The family cross-defendants, and Jermaine in particular, did not merely create a fiction to illegitimately avoid taking on personal liability for unjust or fraudulent acts, but instead acted at worst as negligent or reckless officials with respect to the internal workings of a corporation that was, to the best of their knowledge and to the best of this Court's ability to ascertain, created at the outset and operated with no clearly improper purpose on the part of the defendants, and was moreover run almost exclusively by individuals other than the family cross-defendants.

Moreover, JCI's April 20, 1993 financial statement, on which Smith–Hemion claims to have relied in entering into its agreement with JCI, was not materially inaccurate. The financial statement, including the notes to this statement, reflected that JCI's cash in hand as of March 31, 1993 was $22,278; that its receivables totalled approximately $330,-000, with the collectability of at least half of this sum speculative; that the $200,000 in revenue that had been received from the Casino Association of New Jersey was refundable if the Show were not to go forward; and that JCI's planned joint venture involving the construction and operation of an entertainment complex in Las Vegas was still in negotiation.

Under these circumstances, Smith–Hemion should have properly investigated whether JCI, a new corporation with no track record, little cash, and significant liabilities, was capable of properly holding up its end of the deal in case the Show fell through. Such an investigation would undoubtedly have revealed that JCI was a poor risk as a business partner. Instead, Smith–Hemion decided to enter into a contract with JCI without investigating further, in reliance only on Smith's impressions based on his meetings with various family cross-defendants and other individuals. In light of the considerations noted above, Smith's testimony that various family cross-defendants told him that JCI was planning a number of projects, or that they projected the image of having access to substantial resources, simply does not show either that those cross-defendants purposely misled Smith–Hemion or that further investigation into JCI's financial condition was unnecessary.

The fact that JCI cannot satisfy the judgment does not imply that its shareholders are responsible to cover the corporation's debts, absent a showing that the corporation truly functioned as a mere facade for the cross-defendant shareholders. Here, Smith–Hemion has not made such a showing. Although Smith–Hemion unquestionably got the short end of the stick as it was left owing money to a variety of individuals and entities, its remedies do not lie against the JCI shareholders named as cross-defendants in this action for abuse of the corporate form.

### c. The family cross-defendants are not alter egos of JCI under California law

#### i. The alter ego theory under California law

■ Under California law, the basic rule requires a court to find "such unity of interest and ownership that the separate personalities of the corporation and an individual no longer exist" and that "adherence to the fiction of separate existence would, under the circumstances, promote fraud or injustice." *Stark v. Coker*, 20 Cal.2d 839, 846, 129 P.2d 390 (1942); *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal.App.2d at 837, 26 Cal.Rptr. 806 (citation omitted). The first prong of this test is equivalent to Delaware's test whether the corporation and individual functioned as a single economic entity. As with Delaware law, Smith–Hemion fails to cite, and the Court has not found, any California case in which minority shareholders who do not control the financial purse strings or day to day operations of a corporation have been held alter egos of that corporation.

California courts have considered the following factors in determining the appropri-

ateness of alter ego liability: commingling of funds and other assets; the treatment by an individual of the assets of the corporation as his own; the failure to obtain authority to issue stock or to subscribe to or issue the same; the holding out by an individual that he is personally liable for the debts of the corporation; the failure to maintain minutes or adequate corporate records; sole ownership of all the stock in a corporation by one individual or the members of a family; the failure to inadequately capitalize a corporation; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or business of an individual; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interests, or a concealment of personal business activities; the disregard of legal formalities; the use of the corporate entity to procure labor, services or merchandise from another person or entity; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors; and the contracting with another with intent to avoid performance by use of the corporate entity as a shield against personal liability. *Associated Vendors, Inc. v. Oakland Meat Co.,* 210 Cal.App.2d at 838–40, 26 Cal.Rptr. 806. The Court notes that this list, compiled from the case law by the court in *Associated Vendors,* was not intended to be a definitive legal standard or even an exhaustive checklist, but was developed as a list of factors considered by courts in arriving at the ultimate questions of whether the requisite unity of interest and inequitable result are present in a given case. Where an examination of the corporate structure reveals no unity of interest between any defendant and the corporation, as well as a lack of control by defendants over the corporation's finances and operations, the presence or absence of any one of these factors is not dispositive.

### ii. Application of California law to this case

As set forth above in the section on Delaware law, while some of the factors indicative of alter ego liability are present, many are not. On one hand, JCI did fail to maintain adequate minutes, and was ultimately undercapitalized for the venture which it under-

took. On the other hand, the evidence does not support a finding that any family cross-defendant commingled corporate funds and other assets; treated the assets of the corporation as his or her own; held out that he or she was personally liable for the debts of the corporation; used the corporation as a mere shell, instrumentality or conduit for a single venture or business of an individual; concealed or misrepresented the identity of the responsible ownership, management and financial interests, or personal business activities; diverted assets from JCI by or to any entity to the detriment of creditors; or contracted with Smith–Hemion with intent to avoid performance by use of the corporate entity as a shield against personal liability; or that the family cross-defendants individually owned all or even a majority of stock in the corporation.

There is little doubt that Smith–Hemion has been left in a difficult position, at least in part because of the word and deeds of Jermaine. Nonetheless, as pointed out by the court in *Associated Vendors,* "the prerequisite of 'inequitable result' must coexist with the other requirement of unity of interest and ownership.... Certainly, it is not sufficient to merely show that a creditor will remain unsatisfied if the corporate veil is not pierced, and thus set up such an unhappy circumstance as proof of an 'inequitable result.' In almost every instance where a plaintiff has attempted to invoke the doctrine he is an unsatisfied creditor. The purpose of the doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, where some conduct amounting to bad faith makes it inequitable ... for the equitable owner of a corporation to hide behind its corporate veil." *Associated Vendors, Inc. v. Oakland Meat Co.,* 210 Cal.App.2d at 842, 26 Cal.Rptr. 806.

Here, as set forth above in the discussion on Delaware law, because no family cross-defendant actually controlled either the day-to-day operations or the finances of the corporation, no family cross-defendant is the "equitable owner" of the corporation. The presence of an inequitable result cannot satisfy this very basic requirement of the alter ego doctrine.

**1296**

#### d. Conclusion

In contending that the family cross-defendants are alter egos of JCI, Smith–Hemion asks that the Court stretch the alter ego doctrine well beyond any prior application under either Delaware or California law. Smith–Hemion cites no authority that even comes close to holding shareholders liable in a situation such as the one presented here.

#### IV. Conclusion

Based on the above analysis, the Court finds that cross-plaintiff Smith–Hemion Productions, Inc. has not proven by a preponderance of the evidence that (1) cross-defendant Michael Jackson is liable to Smith–Hemion for promissory estoppel, or (2) Katherine, Joseph, Rebbie, Jackie, Jermaine, Tito, Marlon, or Randy Jackson is liable to Smith–Hemion for the debts of the corporation Jackson Communications, Inc. as the alter ego of that corporation. Judgment will therefore be entered in favor of cross-defendant Michael Jackson on the promissory estoppel cause of action, and in favor of cross-defendants Katherine Jackson, Joseph Jackson, Rebbie Jackson, Jackie Jackson, Jermaine Jackson, Tito Jackson, Marlon Jackson, and Randy Jackson on the alter ego cause of action. All other causes of action in the pending action have been disposed of previously.

Each party is to bear its own costs of litigation.

IT IS SO ORDERED.